**NATIONAL UNION INSURANCE COMPANY, individually, and National Union Insurance Company, as Subrogee of Schneider National Carriers, Inc., Plaintiffs,**

v.

**DOWD & DOWD, P.C., an Illinois Professional Corporation, and Patrick C. Dowd, Robert J. Golden, Jeffrey E. Kehl, and Patrick J. Ruberry, individually, Defendants.**

No. 97 C 6200.

United States District Court, N.D. Illinois, Eastern Division.

April 20, 1998.

William G. Stone, Erica M. Lewis, Bullaro, Carton & Stone, Chicago, IL, for National Union Insurance Company, Individually and as Subrogee of—Schneider National Carriers, Inc., plaintiffs.

Gary A. Grasso, Shawn Valukas, Johnson & Bell, Ltd., Chicago, IL, for Dowd & Dowd, P.C., an Illinois Professional Corporation, Patrick C. Dowd, individually, Robert J. Golden, individually, Jeffrey E. Kehl, individually, Patrick J. Ruberry, individually, defendants.

## *OPINION AND ORDER*

NORGLE, District Judge.

Before the court is Defendants' Motion to Dismiss. For the following reasons, the motion is granted in part, and denied in part.

## I. BACKGROUND

On September 2, 1997, Plaintiffs, National Union Insurance Company, individually, and National Union Insurance Company, as subrogee of Schneider National Carriers, Inc. ("National Union"), filed a two-count complaint against Defendants, Dowd & Dowd, P.C., an Illinois professional corporation, and Patrick C. Dowd, Robert J. Golden, Jeffrey E. Kehl, and Patrick J. Ruberry, individually (collectively "Dowd & Dowd"), for legal malpractice. This case arises out of Dowd & Dowd's representation of Schneider National Carriers, Inc. ("Schneider"), and its driver, Henry Howard ("Howard"), in a personal injury case.

On June 29, 1992, Howard, while operating a Schneider semi-tractor trailer, collided with a stationary lift truck. Immediately before the collision, John Miksis ("Miksis") was standing on a mechanical lift platform suspended over the intersection of Indiana State Highway 6 and Highway 35, changing a lightbulb in the traffic control signal. As a result of the collision, Miksis was thrown from the lift platform to the street, and sustained severe injuries, including brain damage and the loss of control of his legs.

Miksis filed a lawsuit against Schneider and Howard in the United States District Court of the Northern District of Indiana. Schneider had a self-insured retention [1] for $3 million and excess insurance [2] for $5 million with National Union. Schneider retained Dowd & Dowd to represent and defend Schneider and Howard. After trial, a jury awarded Miksis $10 million in damages, but also found Miksis 20 percent at fault for the accident. The trial court thus entered a verdict against Schneider and Howard for $8 million. The verdict was upheld on appeal. Consequently, Schneider paid the first $3 million and National Union paid the remaining $5 million.

National Union then brought the instant legal malpractice claim against Dowd & Dowd. Dowd & Dowd moves to dismiss, and argues that an excess insurer cannot maintain a legal malpractice action against the insured's defense attorney.

## II. DISCUSSION [3]

The court will deny a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) unless "it is impossible [for the plaintiff] to prevail 'under any set of facts that could be proved consistent with [his] allegations.' " *See Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir.1997) (*quoting*

---

**1.** A self-insured is much like a primary insurer in that both are generally obligated to pay the first level of loss and to retain a defense counsel. *See* Scott M. Seaman & Charlene Kittredge, *Excess Liability Insurance: Law and Litigation,* 32 Tort & Ins. L .J. 653, 656 (1997).

**2.** An excess insurer is generally obligated to pay the second level of loss after a predetermined amount of primary insurance or self-insured retention has been exhausted, and is not generally obligated to retain a defense counsel. *Id.*

**3.** The parties agree that Illinois law governs the resolution of this case. Thus, without engaging in a choice-of-law analysis, the court will apply Illinois law. *See Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.,* 136 F.3d 1116, 1120 (7th Cir.1998) (" 'The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the court sits.' ") (citation omitted).

*Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). In reviewing the plaintiff's complaint, the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences therefrom in the light most favorable to the plaintiff. *See Gutierrez v. Peters,* 111 F.3d 1364, 1368–69 (7th Cir.1997).

 In Illinois, to state a cause of action for legal malpractice, the plaintiff must plead: (1) that the attorney owed the plaintiff a duty of care arising from an attorney-client relationship; (2) that the defendant breached that duty; and (3) that as a proximate cause, the plaintiff suffered actual damages. *See Kling v. Landry,* 292 Ill.App.3d 329, 226 Ill.Dec. 684, 688, 686 N.E.2d 33, 37 (1997). Dowd & Dowd argue that National Union cannot state a cause of action for legal malpractice because it cannot establish the first prerequisite, an attorney-client relationship.

 In response, National Union argues that an attorney-client relationship existed, and advances two theories in support of its position.[4] First, National Union argues that Dowd & Dowd had two clients, the self-insured (Schneider) and the excess insurer (National Union). Second, National Union argues that Dowd & Dowd owed it a duty of care because Schneider retained Dowd & Dowd for the direct and/or primary benefit of National Union. Alternatively, National Union argues that it, as the excess insurer, is equitably subrogated[5] to Schneider's legal malpractice action against Dowd & Dowd.

 The Illinois Supreme Court has not had occasion to address the issues presented here, nor have the Illinois Appellate Courts. In this case of first impression, National Union asks the court to expand Illinois law and predict that the Illinois Supreme Court would recognize an excess insurer's direct or derivative right to maintain a legal malpractice action against the insured's defense attorney. Given that the court has little guidance from the Illinois courts, it would be far more preferable to certify the issue to the Illinois Supreme Court. However, District Courts do not have that luxury in Illinois.[6] *See* Ill. Comp. Stat. S.Ct. Rule 20. Hence, it is incumbent upon the court to predict how the Illinois Supreme Court would decide these novel issues. *See Allen v. Transamerica Ins. Co.,* 128 F.3d 462, 466 (7th Cir.1997). In so doing, the court will extrapolate from existing statements of Illinois law and will consider law from other jurisdictions only insofar as they are consistent with the principles of Illinois law. *See Zenith Ins. Co. v. Employers Ins. of Wausau,* 141 F.3d 300, 303–04 (7th Cir.1998).

### A. Direct Claim

 A legal malpractice claim is primarily a tort claim for negligence based upon an attorney's failure to exercise the requisite degree of skill and care in representing his client. See *Christison v. Jones,* 83 Ill.App.3d 334, 39 Ill.Dec. 560, 561, 405 N.E.2d 8, 9 (1980). However, the duty allegedly breached arises by a contract for legal services. *Id.* "The attorney-client relationship is a voluntary, contractual relationship that requires the consent of both the attorney and client." *In re Chicago Flood Litig.,* 289 Ill.App.3d 937, 224 Ill.Dec. 860, 864, 682 N.E.2d 421,

---

**4.** The court is aware that National Union interjects new factual allegations and attaches an exhibit not referenced by the pleadings in arguing that it had an implied contract with Dowd & Dowd. However, "[i]n reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves." *Adams v. Adkins,* No. 97 C 5981, 1998 WL 111632, at *2 (N.D.Ill. March 6, 1998). As such, the court will not address this argument.

**5.** In Illinois, the doctrine of equitable subrogation is predicated on the principle that substantial justice is obtained by allowing one who has indemnified another, pursuant to a legal obligation, to step into the shoes of the one whose claim or debt has been paid. *See Dix Mut. Ins. Co. v. LaFramboise,* 149 Ill.2d 314, 173 Ill.Dec. 648, 650, 597 N.E.2d 622, 624 (1992); *Dworak v. Tempel,* 17 Ill.2d 181, 161 N.E.2d 258, 263 (Ill. 1959).

**6.** Of course, if this or any comparable case were to be before the Seventh Circuit, and if the Seventh Circuit was concerned that the court inaccurately predicted what the Illinois Supreme Court would itself rule on these issues, the Seventh Circuit could invoke Illinois Supreme Court Rule 20 and certify the issues to the Illinois Supreme Court. *See* Ill. Comp. Stat. S.Ct. Rule 20.

425 (1997). Once the attorney-client relationship is formed, "the attorney owes his client the utmost degree of fidelity, honesty, and good faith." *Christison*, 39 Ill.Dec. at 562, 405 N.E.2d at 10.

The fiduciary relationship between an attorney and his client is personal and confidential. *See id.* at 562–63, 405 N.E.2d at 10–11. "In recognition of the personal character of the relationship, it has always been jealously guarded and restricted to the parties involved." *Id.* Thus, it is well established in Illinois that only a client can assert a legal malpractice claim. *See Kleinwort Benson North Am., Inc. v. Quantum Fin. Serv. Inc.*, 181 Ill.2d 214, 229 Ill.Dec. 496, 501, 692 N.E.2d 269, 274 (1998) (*citing Christison*, 39 Ill.Dec. at 560, 405 N.E.2d at 8). Here, National Union advances two theories to show that an attorney-client relationship was formed between itself and Dowd & Dowd. The court will address each theory in turn.

### 1. Tripartite Relationship

First, National Union maintains that Dowd & Dowd, by representing National Union's insured, Schneider, also represented Schneider's excess insurer, National Union. In order to support this position, National Union argues that the Illinois Supreme Court would expand what is sometimes referred to as the "tripartite relationship" among an attorney, an insured and a primary insurer[7], to recognize that the attorney also owes a fiduciary duty to the excess carrier.

In Illinois, it has long been recognized that an attorney retained by a primary insurer to represent its insured has a fiduciary duty to two clients: (1) the insured and (2) the primary insurer. *See Maryland Cas. Co. v. Peppers*, 64 Ill.2d 187, 355 N.E.2d 24, 30–

31 (1976); *Mobil Oil Corp. v. Maryland Cas. Co.*, 288 Ill.App.3d 743, 224 Ill.Dec. 237, 246, 681 N.E.2d 552, 561 (1997); *Cincinnati Co. v. West Am. Ins. Co.*, 287 Ill.App.3d 505, 223 Ill.Dec. 147, 152, 679 N.E.2d 91, 96 (1997). Consequently, either the insured or the primary insurer can sue the retained attorney for legal malpractice. *See Smiley v. Manchester Ins. & Indemnity Co. of St. Louis*, 71 Ill.2d 306, 16 Ill.Dec. 487, 375 N.E.2d 118 (1978) (insurer sued the retained attorney); *Rogers v. Robson, Masters, Ryan, Brumund and Belom*, 74 Ill.App.3d 467, 30 Ill.Dec. 320, 392 N.E.2d 1365 (1979) (insured sued the retained attorney).

National Union argues that the Illinois Supreme Court would likewise recognize an excess insurer's right to bring a legal malpractice claim since "there is no logical reason to distinguish between a primary insurer and an excess carrier in determining when an insurer may sue for malpractice." (National Union's Resp. at 6.) This argument, however, completely ignores the fact that primary insurers actually contract with the attorney for his legal services.

"In Illinois an insurer is obligated to defend an action against an insured when the complaint in that action sets forth allegations which bring the claim potentially within the coverage of the insurance policy." *Nandorf, Inc. v. CNA Ins. Co.*, 134 Ill.App.3d 134, 88 Ill.Dec. 968, 971, 479 N.E.2d 988, 991 (1985) (*citing Peppers*, 64 Ill.2d 187, 355 N.E.2d 24). A primary insurer's duty to defend its insured generally includes the right to select the attorney and to control the litigation. *Id.* Since the primary insurer contracts with the attorney, pays the attorney's legal fees, and directs the litigation or settlement of the claim, it stands to reason that the primary insurer is one of the attorney's clients.[8] *See*

---

7. The parties assume that self-insurers and primary insurers enjoy the same rights and duties in Illinois. The court's own research has revealed that Illinois courts have a propensity to treat self-insurers as the equivalent of primary insurers. *See cf. Missouri Pac. R.R. Co. v. Int'l Ins. Co.*, 288 Ill.App.3d 69, 223 Ill.Dec. 350, 359, 679 N.E.2d 801, 810 (1997) (The Illinois court found that the self-insured retention constituted primary insurance.). The court is mindful that this particular issue is highly controversial and not yet well settled. *See* Hall F. McKinley, III, G. Randall Moody, & Peter B. Barlow, *Issues in the Selection of Counsel and Control of Litigation*

*When the Insured has a Self–Insured Retention*, 32 Tort & Ins. L.J. 769, 772 (1997) ("A minority of states have ... treated self-insurance as 'other insurance.' "). Nevertheless, in light of *Missouri Pac. R.R. Co.*, the court will treat Schneider as both the insured and the primary insurer for purposes of this opinion.

8. "Ordinarily, since the interests of insurer and insured are harmonious, there is no conflict and the attorney is able to exercise independent judgment for both clients [the insured and the primary insurer]." *Rogers*, 30 Ill.Dec. 320, 392 N.E.2d at 1371.

*In re Chicago Flood Litig.*, 289 Ill.App.3d 937, 224 Ill.Dec. 860, 864, 682 N.E.2d 421, 425 (1997) ("The attorney-client relationship is a voluntary, contractual relationship that requires the consent of both the attorney and client.").

■ Excess insurers, on the other hand, do not have the duty to defend the insured. *See Am. States Ins. Co. v. Liberty Mut. Ins. Co.*, 291 Ill.App.3d 336, 225 Ill.Dec. 342, 344, 683 N.E.2d 510, 512 (1997). The rationale behind this rule is the recognition that excess insurance and primary insurance provide distinct types of coverage. *See Royal Ins. Co. v. Process Design Assoc., Inc.*, 221 Ill.App.3d 966, 164 Ill.Dec. 290, 298, 582 N.E.2d 1234, 1242 (1991). Primary insurance is primary insurance coverage that attaches immediately upon the happening of the occurrence or accident that exposes the insured to potential liability. *Id.* Excess insurance, however, is secondary insurance coverage that does not attach until a predetermined amount of primary insurance is exhausted. *Id.*

Since the excess insurer generally has no legal or contractual duty to defend, "[t]he excess carrier typically has no right to select counsel or direct counsel's actions, and in many cases will have no active involvement in the ongoing litigation until such time as it appears that the excess policy coverage might be implicated." Hall F. McKinley, III, G. Randall Moody, & Peter B. Barlow, *Issues in the Selection of Counsel and Control of Litigation When the Insured has a Self-Insured Retention*, 32 Tort & Ins. L.J. 769, 773 (1997). Thus, unlike a primary insurer, an excess insurer has no direct relationship with the attorney retained to defend an action against the insured.

■ Illinois courts' recognition of the tripartite relationship is premised upon the recognition of the primary insurer's legal duty to retain and pay for an attorney to defend an action against its insured. *See Nandorf, Inc.*, 88 Ill.Dec. at 971, 479 N.E.2d at 991 ("Generally, the insurer's duty to defend includes the right to assume control of the litigation."). As such, the court is convinced that the Illinois Supreme Court is likely to restrict the tripartite relationship to an attorney, an insured, and an insurer who retains the attorney. Here, National Union

does not allege that it retained Dowd & Dowd. In fact, National Union admits that it was Schneider who retained Dowd & Dowd to represent and defend the interests of Schneider and Howard. (Compl. at ¶ 12.) Thus, under the theory of the tripartite relationship, no attorney-client relationship existed between National Union and Dowd & Dowd; therefore, Dowd & Dowd owed no fiduciary duty to National Union. Accordingly, to the extent that Count I of National Union's complaint attempts to state a legal malpractice claim based on this theory, Dowd & Dowd's motion to dismiss is granted.

As a final point on this particular issue, the court notes that National Union argues that "other jurisdictions have expressly found that defense counsel owes a duty to an *excess* insurer." (National Union Resp. at 7 (emphasis in original).) Yet National Union only cites to an unpublished opinion in *American International Adjustment Co. v. Galvin*, No. 92 CV 160 (N.D.Ind.), *rev'd on other grounds*, 86 F.3d 1455 (7th Cir.1996). Relying on the unpublished opinion of *Galvin*, National Union argues that the United States District Court of the Northern District of Indiana "found that, based in part upon the Illinois appellate court decision in *Nandorf*, an excess carrier has standing to bring a malpractice action against defense counsel since the attorney owes a duty to the excess insurer, as well as to the insured." (National Union's Resp. at 7.) However, National Union's interpretation of the *Galvin* opinion is misguided.

In *Galvin*, the District Court stated that the specific issue before the court was "whether an attorney *retained by an insurance company* has a duty to the insurer as well as the insured." *Galvin*, No. 92 CV 160, at 7 (emphasis added). The District Court held that an attorney retained by an insurance company to represent its insured owes a duty to the insurer. *Id.* at 10. On appeal, whether the insurer actually retained the insured's attorney was not an issue. *See Galvin*, 86 F.3d at 1459 ("The main issue on appeal is ... whether the district court correctly ruled that Galvin's conduct was malpractice as a matter of law."). The Seventh Circuit did, however, note that the insured

tendered its defense to its liability insurer. *Id.* at 1458, n. 1. Thus, the insurer was allowed to pursue its legal malpractice action against the attorney it retained to represent its insured in the underlying personal injury action. *Id.; see also Galvin,* No. 92 CV 160, at 7–10. Since the insurer in *Galvin,* unlike National Union, retained the attorney it later sued, National Union's reliance upon *Galvin* is misplaced.

### 2. *Third-Party Beneficiary*

Second, National Union contends that it can prove facts to establish that Schneider retained Dowd & Dowd for the direct and/or primary benefit of National Union. Hence, National Union argues that the Illinois Supreme Court would recognize National Union as a third-party beneficiary. In addition, National Union argues that "the nature of National Union's relationship with Defendants and Schneider is an issue of fact which should not be resolved in a Rule 12(b)(6) motion to dismiss." (National Union's Resp. at 10.)

As a preliminary matter, it is well settled that "[t]he determination of the duty—whether the defendant and the plaintiffs stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiffs—is an issue of law for the determination of the court." *Pelham v. Griesheimer,* 92 Ill.2d 13, 64 Ill.Dec. 544, 546, 440 N.E.2d 96, 98 (1982). Thus, the court will turn to the merits of National Union's claim.

As a general rule, an attorney only owes his client a duty to exercise the requisite degree of skill and care. *See id.* at 547, 440 N.E.2d at 99. However, Illinois recognizes one exception to that general rule. *Id.* In *Pelham,* the Illinois Supreme Court held that an attorney owes a fiduciary duty to his client and any intended third-party beneficiaries. *Id.* at 549, 440 N.E.2d at 101. In order to prove that the third-party was an intended beneficiary, the third-party must show "that the relationship between the attorney and his client was entered into for the primary and direct benefit of the [third-party]." *Id.* "The key consideration is [that] the attorney's acting at the direction of or on behalf of the

client to benefit or influence a third party." *Id.* at 548, 440 N.E.2d at 100.

In recognizing that an attorney owed a duty to a third-party beneficiary, the Illinois Supreme Court cautioned against recognizing such a duty when a client's interest is involved in an adversarial proceeding. *Id.* Accordingly, "[i]n cases of an adversarial nature, in order to create a duty on the part of the attorney to one other than a client, there must be a clear indication that the representation by the attorney is intended to directly confer a benefit upon the third party." *Id.*

"Applying the 'intent to directly benefit' test to the facts alleged in the complaint," *id.,* the court is convinced that the Illinois Supreme Court would not find that the relationship between Dowd & Dowd and Schneider was entered into for the primary and direct benefit of National Union. As National Union states in its complaint, Schneider retained Dowd & Dowd to represent and defend the interests of Schneider and Howard. (Compl. at ¶ 12.) Appropriately, Schneider's intent was to directly benefit itself and Howard. Of course, because the interests of Howard, Schneider, and National Union were generally harmonious, Dowd & Dowd's representation of Schneider and Howard would as a consequence benefit National Union. Nonetheless, absent a clear indication of Schneider's intent to primarily benefit National Union, the Illinois Supreme Court is not likely to find that National Union was an intended third-party beneficiary to whom Dowd & Dowd owed a direct duty of care. *See Pelham,* 64 Ill.Dec. at 549, 440 N.E.2d at 101. Therefore, the court predicts that the Illinois Supreme Court would not expand the third-party beneficiary theory to recognize an excess insurer as an intended third-party beneficiary. Accordingly, to the extent that Count I of National Union's complaint attempts to state a legal malpractice claim based on this theory, Dowd & Dowd's motion to dismiss is granted.

### B. Equitable Subrogation Claim

Assuming *arguendo* that National Union has no right to state a direct legal malpractice claim against Dowd & Dowd, National Union alternatively argues that it,

as the excess insurer, is equitably subrogated to Schneider's legal malpractice claim against Dowd & Dowd. The parties direct the court to law from other jurisdictions to predict whether the Illinois Supreme Court would recognize an excess insurer's equitable subrogation claim against the insured's defense attorney. Before examining law from other jurisdictions, however, the court is compelled to extrapolate from existing statements of Illinois law to predict what the Illinois Supreme Court would do if faced with the present issue. *See Zenith Ins. Co.,* 141 F.3d 300, 303–04.

### 1. *Illinois Law*

The Illinois Supreme Court has not yet addressed whether an excess insurer has a right to be equitably subrogated to its insured's legal malpractice claim against his defense attorney. The court's own research has, nonetheless, revealed that the Illinois Supreme Court has applied equitable subrogation in a different insurance context. *See Dix Mut. Ins. Co. v. LaFramboise,* 149 Ill.2d 314, 173 Ill.Dec. 648, 650, 597 N.E.2d 622, 624 (1992); *New Amsterdam Cas. Co. v. Certain Underwriters at Lloyds, London,* 34 Ill.2d 424, 428, 216 N.E.2d 665, 669 (1966); *Dworak v. Tempel,* 17 Ill.2d 181, 186, 161 N.E.2d 258, 263 (1959). Thus, for some guidance, the court will examine the Illinois Supreme Court's underlying rationale for recognizing an insurer's right to equitable subrogation under different circumstances.

In *Dworak* and *LaFramboise,* the Illinois Supreme Court recognized an insurer's right to be equitably subrogated to its insured's claims against the tortfeasor who caused the insured's loss. *See LaFramboise,* 173 Ill. Dec. 648, 597 N.E.2d at 624; *Dworak,* 161 N.E.2d at 263; *see also Illinois Farmers Ins. Co. v. Makovsky,* 293 Ill.App.3d 77, 228 Ill. Dec. 559, 563–64, 689 N.E.2d 618, 622–23 (1997) (Applying doctrine of equitable subrogation, the Illinois Appellate Court concluded, "based on the principle that a subrogee attains all of the rights of a subrogor, the statute of limitations applicable to a minor subrogor is equally applicable to a subrogee insurance carrier."); *State Farm Gen. Ins. v. Stewart,* 288 Ill.App.3d 678, 224 Ill.Dec. 310, 315, 681 N.E.2d 625, 630 (1997) ("An insurer who indemnifies its insured for a loss may be subrogated to the rights of the insured against the party at fault under the equitable doctrine that the economic burden 'should be shifted to the party responsible for the loss.' "). The insurer in *Dworak* paid its insured for property damage he sustained as a result of a third-party's intoxication. *See Dworak,* 161 N.E.2d at 260. The insurer brought a direct claim, as well as a subrogated claim, against the tavern that sold alcohol to the third-party under the Liquor Control Act. *Id.* The Illinois Supreme Court held that the insurer could only assert a subrogated claim. *Id.* at 263.

The Illinois Supreme Court reasoned that " '[t]he theory of the subrogation cases is predicated on the equitable doctrine that one who has indemnified another in pursuance of his obligation to do so, is entitled to the means of redress held by the party indemnified against the individual causing the loss.' " *Id.* (citations omitted). Hence, the Illinois Supreme Court held that the insurer is equitably subrogated to any rights the insured would be entitled to assert himself. *Id.* Since the insured in *Dworak* had a remedy against the intoxicated person and the tavern, the Illinois Supreme Court concluded that the insurer was entitled to "stand in the shoes of its insured, and enjoy the same means of redress arising out of the transaction." *Id.*

The Illinois Supreme Court also recognized that "such a course would be thoroughly consistent with the equitable considerations underlying the doctrine of subrogation. It is basic to the doctrine that one who indemnified the innocently injured party should be entitled to shift the economic burden so that it rests upon those responsible for the loss, and their insurers." *Id.* at 264.

Similarly, the Illinois Supreme Court recognized an insurer's right to equitable subrogation in *LaFramboise. See LaFramboise,* 173 Ill.Dec. at 650, 597 N.E.2d at 624. In *LaFramboise,* the insurer paid its insured "$40,579 for a fire loss on certain real property." *Id.* at 649, 597 N.E.2d at 623. The insurer sought to recover the $40,579, by way of equitable subrogation, from the tenant who allegedly caused the fire loss. *Id.*

The Illinois Supreme Court stated that the doctrine of subrogation is:

a method whereby one who has involuntarily paid a debt or claim of another succeeds to the rights of the other with respect to the claim or debt so paid. (Citation omitted.) The right of subrogation is an equitable right and remedy which rests on the principal that substantial justice should be attained by placing ultimate responsibility for the loss upon the one against whom in good conscience it ought to fall. (Citation omitted.) Subrogation is allowed to prevent injustice and unjust enrichment but will not be allowed where it would be inequitable to do so.

*Id.* at 650, 597 N.E.2d at 624.

"One who asserts a right of subrogation must step into the shoes of, or be substituted for, the one whose claim or debt he has paid and can only enforce those rights which the latter could enforce." *Id.* Consequently, in order for the insurer to assert a right of subrogation, (1) the insured must have a cause of action against the purported tortfeasor, and (2) it must be equitable to allow the insurer to enforce a right of subrogation. *Id.* at 651, 597 N.E.2d at 625. Though the Illinois Supreme Court in *LaFramboise* generally recognized the doctrine of equitable subrogation, the Illinois Supreme Court held that the insurer could not maintain a subrogation action against the tenant because it held that the tenant, under the particular facts of that case, was a co-insured under the insurance policy. *Id.* at 652, 597 N.E.2d at 626 ("It is well settled that an insurer may not subrogate against its own insured or any person or entity who has the status of a co-insured under the insurance policy.").

The court is mindful that the facts in *Dworak* and *LaFramboise* are distinguishable to the facts in this case in two respects. First, the insurers in *Dworak* and *LaFramboise* were presumably primary insurers. *See LaFramboise*, 173 Ill.Dec. at 649, 597 N.E.2d at 623; *Dworak*, 161 N.E.2d at 260. Second, the insurers in *Dworak* and *LaFramboise* provided first-party insurance which was intended to protect the insured against loss as a result of injuries to the insured's person or property. *See* Lee R. Russ & Thomas F. Segalla, 7 Couch on Ins. § 101:58 (3d ed.1997). In contrast, National Union provided excess third-party or liability insurance which was intended to protect its insured against risk of excess liability as a result of causing injuries to a third-party's person or property. *Id.*

However, it is doubtful that the Illinois Supreme Court would deem these factual differences as dispositive in applying the doctrine of equitable subrogation. The general principle to be gleaned from *Dworak* and *LaFramboise* is that equitable subrogation should be applied to prevent injustice and to shift the economic burden upon those responsible for the loss. *See LaFramboise*, 173 Ill.Dec. at 649, 597 N.E.2d at 623; *Dworak*, 161 N.E.2d at 263. Based upon the rationale underlying *Dworak* and *LaFramboise*, the court cannot discern any reason to limit this general principle to a primary insurer, providing first-party insurance.

In fact, it appears that the Illinois Supreme Court has recognized an excess liability insurer's right to assert a subrogation action against a primary liability insurer for amounts paid in settlement of an insurance claim and expenses incurred in defending the insured. *See New Amsterdam Cas. Co.*, 216 N.E.2d at 669. In *New Amsterdam Casualty Co.*, the insured's primary liability insurer refused to defend the insured against a personal injury action arising out of an automobile accident. *Id.* at 666. As a result, the excess liability insurer undertook the defense of the insured and settled the case within the primary insurance policy. *Id.* After paying the settlement amount, the excess liability insurer sued the primary liability insurer. *Id.* The critical issue in that case was whether the plaintiff was an excess, primary, or co-primary insurer. *Id.* at 666–67. The Illinois Supreme Court examined the relevant insurance policies and found that the plaintiff was an excess liability insurer, and that the primary liability insurer should bear the cost of the insured's defense and settlement. *Id.* at 668–669. Thus, the Illinois Supreme Court allowed the excess liability insurer to be subrogated to the insured's right to be fully protected for damages and costs of defense that the primary liability insurer was responsible to pay. *Id.* at 669.

The court is mindful that the Illinois Supreme Court in *New Amsterdam Casualty*

Co. did not expressly state that it was an equitable right to subrogation which arises by operation of law, as opposed to a contractual right to subrogation which arises by operation of contract. *See Am. Nat'l Bank and Trust Co. of Chicago v. Weyerhaeuser Co.,* 692 F.2d 455, 460 (7th Cir.1982). However, because the court did not identify or discuss any contractual terms giving rise to the right of subrogation, the court interprets the case to support the recognition of an excess liability insurer's right to assert an equitable subrogation claim against the primary liability insurer.[9] *But cf. Twin City Fire Ins. Co. v. Country Mutual Ins. Co.,* 23 F.3d 1175, 1178 (7th Cir.1994) (Illinois courts have not conclusively addressed whether an excess liability insurer can assert an equitable subrogation claim against the primary liability insurer for the negligent or bad faith refusal to settle a claim within the primary insurer's policy limits.).

Even assuming that the Illinois Supreme Court in *New Amsterdam Casualty Co.* did not recognize an excess liability insurer's right to assert an equitable subrogation claim against the primary liability insurer, the court notes that federal courts have generally accepted that the Illinois Supreme Court would allow an excess liability insurer to stand in the shoes of the insured to assert an equitable subrogation claim against the primary liability insurer. *See Twin City Fire Ins. Co.,* 23 F.3d at 1178; *California Union Ins. Co. v. Liberty Mut. Ins. Co.,* 920 F.Supp. 908, 918 (N.D.Ill.1996); *Int'l Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.,* No. 95 C 972, 1996 WL 411502, at *1 (N.D.Ill. July 16, 1996).

■ The underlying rationale for applying the doctrine of equitable subrogation in favor of excess liability insurers, and against primary liability insurers, is because when the insured has excess insurance, the excess insurer, rather than the insured, bears the cost of the verdict or settlement in excess of the amount of the primary insurance policy. *See California Union Ins. Co.,* 920 F.Supp. at 918, n. 4. Thus, courts have concluded that it is equitable and just to allow an excess insurer to recoup its losses by way of equitable subrogation, *id.,* if the primary liability insurer's failure to settle the claim in good faith within its policy limit exposed the insured, and therefore the excess insurer, to a judgment in excess of the primary liability insurer's policy limit. *Id.* at 918.

Furthermore, "Illinois courts have stated [that] '[t]he doctrine of subrogation is broad enough to include every instance in which one person, not a mere volunteer, pays a debt for which another is primarily liable and which in equity and good conscience should have been discharged by the latter.'" *See Am. Nat'l Bank and Trust Co. of Chicago,* 692 F.2d at 460 (citations omitted). Moreover, the Illinois Supreme Court in *Dworak* announced that it is

the policy of this court to apply the expanding doctrine of subrogation, which originated in equity, and is now an integral part of the common law, in all cases where its essential elements are present, and where it effectuates a just resolution of the rights of the parties irrespective of whether the doctrine has previously been invoked in the particular situation.

*Dworak,* 161 N.E.2d at 263; *see also Am. Nat'l Bank and Trust Co. of Chicago,* 692 F.2d at 466 ("Illinois courts, [in pursuit of securing substantial justice], have expressly broadened the area in which the remedy of subrogation is available.").

Accordingly, based on the foregoing statements of Illinois law, the court is convinced that the Illinois Supreme Court would recognize an excess liability insurer's right to be equitably subrogated to its insured's rights unless the nature of the claim sought to be subrogated and the public policy considerations implicated dictate a contrary conclusion.[10] *Cf. Christison,* 39 Ill.Dec. at 561, 405

---

9. Of course, given the potential for conflicting interpretation of *New Amsterdam Casualty Co.,* the court will not exclusively rely on its independent interpretation in predicting whether the Illinois Supreme Court would recognize an excess liability insurer's right to assert an equitable subrogation claim against the insured's attorney.

10. The court acknowledges the qualitative differences between assignment and equitable subrogation, but notes that both produce the same result: a nonclient's right to assert a legal malpractice claim against the assignor's (or subrogator's) attorney. Hence, the court will consider the Illinois courts' underlying rationale for rejecting assignment of legal malpractice claims in

N.E.2d at 9 (In order to determine whether a claim is assignable, Illinois courts examine the nature of the claim sought to be assigned and the public policy considerations implicated.). Hence, the court now turns to the nature of the claim sought to be subrogated and the public policy considerations implicated.

In this case, National Union seeks to be equitably subrogated to Schneider's legal malpractice claim against Dowd & Dowd. Illinois courts recognize that "the real substance of a malpractice action is a client's claim that his attorney has breached his personal duty and trust to that client by failing to give the utmost loyalty and fidelity to the client's interests." *Christison*, 39 Ill.Dec. at 561, 405 N.E.2d at 9. In appreciation of the personal character of the attorney-client relationship, Illinois courts have "jealously guarded and restricted" the relationship to the parties involved. *Id.* As such, Illinois court have held that legal malpractice claims are not subject to assignment. *See Kleinwort Benson North Am., Inc. v. Quantum Fin. Serv., Inc.*, 229 Ill.Dec. at 498, 692 N.E.2d at 271 (1998).

In articulating the public policy considerations surrounding the attorney-client relationship and any potential assignability of legal malpractice claims, the Illinois Appellate Court in *Christison* quoted the California Court of Appeals in *Goodley v. Wank & Wank, Inc.*, 62 Cal.App.3d 389, 133 Cal.Rptr. 83, 87 (1976). *See Christison*, 39 Ill.Dec. at 563, 405 N.E.2d at 11. In *Goodley*, the California Court of Appeals stated:

> The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandising such causes of action is the lucrative

business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.

*Goodley*, 133 Cal.Rptr. at 87, *quoted in Christison*, 39 Ill.Dec. at 563, 405 N.E.2d at 11.

Arguably, the policy considerations against assignment of legal malpractice are equally applicable in the context of equitable subrogation. For instance, opponents might argue that if equitable subrogation is applied to permit an excess insurer to assert a legal malpractice claim it may strain the tripartite relationship. The court acknowledges that an attorney's independent, legal judgement might be compromised, consciously or subconsciously, because of concern about being sued by an excess insurer.

■ However, subrogation does not entail any additional burdens. *See Am. Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 484–85 (Tex.1992). It merely allows an excess insurer, who pays for any excess liability, to enforce the duties that the attorney already owes to the insured, who might have little incentive to sue his attorney since he has excess insurance coverage. *Id.; see also Dix Mut. Ins. Co.*, 173 Ill.Dec. at 650, 597 N.E.2d at 624 (the subrogee can only enforce the rights the subrogor has the right to enforce). Evidently, if the insured had not contracted for excess insurance coverage, the attorney would have to be similarly concerned about being sued by the insured for any excess liability. *See Am. Centennial Ins. Co.*, 843 S.W.2d at 484–85. Malpracticing attorneys should not enjoy a windfall merely because the insured contracted for

order to predict whether the Illinois Supreme Court would allow subrogation of such claims.

excess insurance coverage. *Id.* at 484. Further, the social costs of legal malpractice is best borne by the malpracticing attorneys.

Additionally, in the context of equitable subrogation, there is less concern that legal malpractice claims will be converted into a commodity to be exploited by strangers in the market place. "Notwithstanding the Illinois policy favoring a liberal application of subrogation principles, there are several requirements a potential subrogee ... must satisfy before it may assert a right of subrogation." *Am. Nat'l Bank and Trust Co. of Chicago,* 692 F.2d at 460–61.

■ First, "the claim or debt under which the subrogee asserts his rights must have been paid in full." *Id.* at 461. Second, "the subrogee must have paid a claim or debt for which a third party—not the subrogee—is primarily liable either in law or in equity." *Id.* Third, "the subrogor must possess a right which he could enforce against a third party and that the subrogee seeks to enforce the subrogor's right." *Id.* Fourth, "the potential subrogee must not have acted as a 'volunteer' in paying a claim of the subrogor properly lying against a third party." Consequently, the right to be subrogated to a legal malpractice claim would be strictly limited to a non-client who, pursuant to a legal duty, has paid for the client's loss or debt as a result of the attorney's malpractice. *Cf. Dworak,* 161 N.E.2d at 263.

Moreover, any concerns of an uncontrollable flow of frivolous litigation by excess insurers is mere speculation. *See American Employers' Insurance Co. v. Medical Protective Co.,* 165 Mich.App. 657, 419 N.W.2d 447, 448 (1988) (Recognizing an excess insurer's subrogated legal malpractice action "would also encourage excess insurers to sue defense attorneys for malpractice whenever they are disgruntled by having to pay within limits of policies to which they contracted and for which they received premiums."). While recognizing that insurance defense attorneys are exposed to additional malpractice claims by this holding, the court is confident that there are sufficient safeguards to control the floodgates.

Lastly, the court is mindful that excess insurance companies are sophisticated enough to protect themselves. However, the purported subrogee's sophistication have not preclude the Illinois Supreme Court from liberally applying the doctrine of equitable subrogation in other insurance contexts. *See cf. LaFramboise,* 173 Ill.Dec. at 650, 597 N.E.2d at 624; *New Amsterdam Cas. Co.,* 216 N.E.2d at 669; *Dworak,* 161 N.E.2d at 263.

■ Accordingly, the court predicts that the Illinois Supreme Court, after examining the nature of the claim sought to be subrogated and the public policy considerations implicated, would recognize that it would be inequitable to place the burden of legal malpractice upon the excess insurer, allowing a negligent attorney to escape the consequences of his misconduct, merely because the insured lacks the economic incentive to sue. Therefore, the court predicts that the Illinois Supreme Court would allow an excess liability insurer to be equitably subrogated to the insured's legal malpractice claim.

### 2. *Laws of Other Jurisdictions*

Although the court need not go any further, it will also examine the laws of other jurisdictions. Many jurisdictions which have addressed the precise issue before the court have allowed an excess insurer to assert a legal malpractice claim against the insured's defense attorney under the doctrine of equitable subrogation. *See Allstate Ins. Co. v. Am. Transit Ins. Co.,* 977 F.Supp. 197, 201 (E.D.N.Y.1997) (applying New York law); *Am. Centennial Ins. Co. v. Canal Ins. Co.,* 843 S.W.2d 480, 484 (Tex.1992); *Atlanta Int'l Ins. Co. v. Bell,* 438 Mich. 512, 475 N.W.2d 294, 299 (1991); *see cf. Gen. Accident Ins. Co. of Am. v. Schoendorf & Sorgi,* 202 Wis.2d 98, 549 N.W.2d 429, 433 (1996); *Chem. Bank of New Jersey Nat'l Assoc. v. Bailey,* 296 N.J.Super. 515, 687 A.2d 316, 320–21 (1997); *Great Am. Ins. Co. v. Perry,* No. C6–93–1573, 1994 WL 101991, at * 2 (Minn.Ct.App. 1994). However, a few jurisdictions have refused to recognize an excess insurer's right to maintain such an action. *See St. Paul Ins. Co. of Bellaire, Texas v. AFIA Worldwide Ins. Co.,* 937 F.2d 274, 279 (5th Cir.1991) (applying Louisiana law); *Continental Cas. Co. v. Pullman, Comley, Bradley & Reeves,* 929 F.2d 103, 107 (2d Cir.1991) (applying

Connecticut law); *see cf. Bank IV Wichita v. Arn, Mullins, Unruh, Kuhn & Wilson,* 250 Kan. 490, 827 P.2d 758, 766 (1992); *Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg,* 30 Cal.App.4th 1373, 36 Cal.Rptr.2d 424, 430 (1994).

In order to predict what the Illinois Supreme Court would do if presented with the present issue, the court can consider law from other jurisdictions only insofar as they are consistent with the principles of Illinois law. *See Zenith Ins. Co.,* at 303–04. With these principles in mind, the court examines the laws of the other jurisdictions.

The court will first examine the law of the jurisdictions which have refused to recognize an excess insurer's right to assert a legal malpractice claim against the insured's defense attorney by way of equitable subrogation. The seminal case in support of this position is *Pullman,* 929 F.2d at 107. In *Pullman,* the Second Circuit was asked to predict whether the Connecticut Supreme Court would allow an excess insurer to assert a claim, either in contract or tort, against a law firm hired by the primary insurer to represent the insured. *Id.* at 105. Relying on *Krawczyk v. Stingle,* 208 Conn. 239, 543 A.2d 733 (1988), the Second Circuit acknowledged that Connecticut's state public policy favors preserving the personal nature of the attorney-client relationship. *Id.* at 106. Thus, the Second Circuit concluded that the Connecticut Supreme Court would not find that the 'primary or direct purpose' of the attorney-client relationship was to benefit the excess insurer, *id.,* and "would not permit a subrogee excess insurer to file legal malpractice claims against the insured's attorney." *Id.* at 107.

In *St. Paul Insurance Co. of Bellaire, Texas,* 937 F.2d at 279, the Fifth Circuit similarly concluded that Louisiana would not recognize an excess insurer's right to maintain a legal malpractice claim against the primary insurer's attorney. In so holding, the Fifth Circuit recognized that it is well established in Louisiana that the relationship between an attorney and a client is one of principal and agent. *Id.* Thus, the Fifth Circuit concluded that an attorney is not liable to a nonclient unless the attorney exceeds the limits of his agency or if the offended nonclient can establish fraud or collusion. *Id.* In further support of its conclusion, the Fifth Circuit noted that while the Louisiana Supreme Court in *Great Southwest Fire Insurance Co. v. CNA Insurance Cos.,* 557 So.2d 966 (La.1990), "authorized a right of action pursuant to subrogation by an excess insurer against a primary insurer, it did not address the issue of whether the attorney appointed to represent a primary insurer ... owes a similar duty to the excess insurer." *Id.*

Other jurisdictions, on the other hand, have recognized an excess insurer's right to assert a legal malpractice claim against the insured's defense attorney by way of equitable subrogation. The seminal case in support of this position is *American Centennial Insurance Co.,* 843 S.W.2d at 484. In *American Centennial Insurance Co.,* the Texas Supreme Court held that the excess insurer could maintain an equitable subrogation claim against both the primary insurer and the insured's attorney. *Id.* at 482. In holding that an excess insurer may bring an equitable subrogation claim against the insured's attorney, the Texas Supreme Court acknowledged that "Texas courts have been understandably reluctant to permit a malpractice action by a nonclient because of the potential interference with the duties an attorney owes to the client." *Id.* at 484.

Nevertheless, the Texas Supreme Court concluded that "[r]ecognizing an equitable subrogation action by the excess carrier against defense counsel would not, however, interfere with the relationship between the attorney and the client nor result in additional conflicts of interest." *Id.* In arriving at that conclusion, the Texas Supreme Court acknowledged that "[s]ubrogation permits the insurer only to enforce existing duties of defense counsel to the insured." *Id.* The Texas Supreme Court also accepted that "the concerns of the excess and primary carriers and the insured generally overlap in ensuring that the merits of the defense are not precluded from being heard because of attorney malpractice." *Id.*

In addition, the Texas Supreme Court found that the considerations which favored recognizing an excess insurer's right to bring an equitable subrogation claim against the primary insurer also favored recognizing an

excess insurer's right to bring an equitable subrogation claim against the insured's attorney. *Id.*

The Texas Supreme Court then articulated those considerations as follows:

> No new or additional burdens are imposed on the attorney, who already has the duty to represent the insured .... Defense counsel should not be relieved of these obligations merely because the insurer, rather than the client, must pay the claim. If the asserted malpractice has resulted in payment of a judgment or settlement within the excess carrier's policy limits, the insured has little incentive to enforce its right to competent representation. Refusal to permit the excess carrier to vindicate that right would burden the insurer with a loss caused by the attorney's negligence while relieving the attorney from the consequences of legal malpractice. Such an inequitable result should not arise simply because the insured has contracted for excess coverage.

*Id.* at 484–85. Therefore, the Texas Supreme Court held that the insurers should be allowed to pursue their subrogated malpractice action against insured's attorney. *Id.*

Similarly, a United States District Court of the Eastern District of New York predicted that the New York Court of Appeals would recognize an excess insurer's right to assert a legal malpractice claim via equitable subrogation. *See Allstate Ins. Co. v. Am. Transit Ins. Co.*, 977 F.Supp. 197, 201 (E.D.N.Y. 1997). The District Court in *Allstate Insurance Co.* began its analysis by examining New York law. *Id.* at 200. The District Court found that the New York Supreme Court, Appellate Division, allowed an excess insurer to maintain a legal malpractice claim against the insured's attorney. *Id.* (*citing Great Atlantic Ins. Co. v. Weinstein*, 125 A.D.2d 214, 509 N.Y.S.2d 325 (N.Y.App.Div. 1986)). Although the District Court was not bound by lower state court decisions, it appreciated that '[a]bsent strong evidence that the New York Court of Appeals would decide the issue differently, rulings of the intermediate state appellate courts are particularly persuasive evidence of state law.' *Id.* at 201 (citations omitted).

Further, the District Court found that 'New York has evidenced the strength of its concern that parties responsible for defense of an underlying claim be held accountable to excess insurers for wrongdoing' by establishing direct fiduciary duties between excess and primary insurers. *Id.* (*citing Pullman*, 929 F.2d at 107 (2d Cir.1991) (New York is one of the few jurisdictions that have recognized that a primary insurer owes a direct duty to a excess insurer.)). This, the District Court noted, further supported its conclusion that the New York Court of Appeals would allow an excess insurer to maintain a legal malpractice claim against the insured's attorney under the doctrine of equitable subrogation. *Id.*

In addition, the District Court examined the laws of other jurisdictions. *Id.* First, the District Court noted that the Second Circuit in *Pullman* predicted that the Connecticut Supreme Court would refuse to recognize an excess insurer's right to maintain a legal malpractice claim against the insured's attorney. *Id.* In doing so, the Second Circuit rejected the decisions of the Appellate Division in New York, and relied, in part, on the Michigan Court of Appeals decision in *American Employers' Insurance Co. v. Medical Protective Co.*, 165 Mich.App. 657, 419 N.W.2d 447 (1988), instead.

In *American Employers' Insurance Co.*, the Michigan Court of Appeals stated that recognizing such an action

> would in our judgment acknowledge a direct duty owed by the insured's attorney to the excess insurer and would be tantamount to saying that insurance defense attorneys do not owe their duty of loyalty and zealous representation to the insured client alone. Such a holding would contradict the personal nature of the attorney-client relationship, which permits a legal malpractice action to accrue only to the attorney's client. ... Such a holding would also encourage excess insurers to sue defense attorneys for malpractice whenever they are disgruntled by having to pay within limits of policies to which they contracted and for which they received premiums. Were this to occur, we believe that defense attorneys would come to fear such

attacks, and the attorney-client relationship would be put in jeopardy.

*Am. Employers' Ins. Co.,* 419 N.W.2d at 448.

However, as the District Court in *Allstate Insurance Co.* noted, the Michigan Supreme Court in *Atlanta International Insurance Co. v. Bell,* 438 Mich. 512, 475 N.W.2d 294 (1991), rejected the reasoning the Michigan Court of Appeals articulated in *American Employers' Insurance Co.,* and concluded that a primary insurer could maintain a legal malpractice claim against the insured's attorney under the doctrine of equitable subrogation. *See Allstate Ins. Co.,* 977 F.Supp. at 201 *(citing Bell,* 438 Mich. 512, 475 N.W.2d 294 (1991)).

In *Bell,* the Michigan Supreme Court recognized the unique relationship of a primary insurer and the attorney it hired to represent its insured. *See Bell,* 475 N.W.2d at 297. Still, rather than find that an attorney-client relationship exists between the primary insurer and the insured's attorney, the Michigan Supreme Court held that it was best to apply the doctrine of equitable subrogation to allow a primary insurer to assert a legal malpractice claim against the insured's attorney. *Id.*

The Michigan Supreme Court acknowledged that "[a] rule of law expanding the parameters of the attorney-client relationship in the defense counsel-insurercontext [sic] might well detract from the attorney's duty of loyalty to the client in a potentially conflict-ridden setting." *Id.* at 298. Nevertheless, the Michigan Supreme Court reasoned

> to completely absolve a negligent defense counsel from malpractice liability would not rationally advance the attorney-client relationship. Moreover, defense counsel's immunity from suit by the insurer would place the loss for the attorney's misconduct on the insurer. The only winner produced by an analysis precluding liability would be the malpracticing attorney. Equity cries out for application [of equitable subrogation] under such circumstances.

*Id.*

The Michigan Supreme Court further accepted that in a legal malpractice action against the insured's attorney, the primary insurer and the insured have the same interest in having competent legal representation. *Id.* Therefore, the Michigan Supreme Court observed that "the attorney-client relationship, the interests of the client, the interest of the insurer, and ultimately the public, which otherwise would absorb the costs of the malpractice, all benefit" from allowing the primary insurer to maintain its legal malpractice action.[11] *Id.* at 299.

Every jurisdiction which has considered the present issue stressed the importance of safeguarding the personal nature of the attorney-client relationship. The jurisdictions which recognized an excess insurer's right to maintain a legal malpractice action under the doctrine of equitable subrogation, however, did not stop their analysis with that public policy consideration. Those jurisdictions considered other public policy considerations, *e.g.,* shifting the economic burden upon the party causing the loss, along with the degree of damage caused to the attorney-client relationship. In light of Illinois' liberal application of the doctrine of equitable subrogation, the court predicts that the Illinois Supreme Court would consider and balance all of the public policy considerations implicated, and conclude that an excess insurer should be allowed to assert a legal malpractice claim against its insured's defense attorney under the doctrine of equitable subrogation. Therefore, the court denies Dowd & Dowd's motion to dismiss Count II.

### III. CONCLUSION

For the foregoing reasons, the court grants Dowd & Dowd's motion to dismiss Count I, but denies Dowd & Dowd's motion to dismiss Count II.

IT IS SO ORDERED.

---

11. Arguably, since the insurer seeking to sue the insured's attorney in *Bell* was a primary insurer, it is not yet settled whether the Michigan Supreme Court would likewise recognize an excess insurer's right to maintain such an action. *See Bell,* 475 N.W.2d at 297–98.