**PHICO INSURANCE COMPANY,**
Plaintiff,

v.

**AETNA CASUALTY AND SURETY COMPANY OF AMERICA, Travelers/Aetna Property–Casualty Corporation, and Robert T. Sanders, III Defendants.**

No. IP 96–1899–C–T/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 28, 2000.

984

John P McQuillan, Spangler Jennings & Dougherty P C, Merrillville, IN, for plaintiff.

Nicholas C Nizamoff, White & Raub, Indianapolis, IN, for Robert T. Sanders, III, defendant.

Carl R Pebworth, Baker & Daniels, Indianapolis, IN, for Travelers Property Cas. Corp., defendant.

Christopher G Scanlon, Carl R. Pebworth, Baker & Daniels, Indianapolis, IN, for Travelers Cas. & Sur. Co., defendant.

**Entry Ruling On Motions**

TINDER, District Judge.

This action was brought by PHICO Insurance Company ("PHICO"), an excess insurer, against Aetna Casualty and Surety Company of America, Travelers/Aetna Property–Casualty Corporation ("Aetna"),[1] a primary insurer. Aetna tendered the

1. The name has since changed to Travelers Property Casualty Corporation.

policy limits in an underlying tort action brought against its insureds; thereafter, PHICO settled with the plaintiffs in the underlying action. PHICO has sued Aetna to recover the sums paid in that settlement. PHICO filed two motions for partial summary judgment, and Aetna filed a motion for summary judgment on PHICO's complaint. Also pending are the following: (1) Aetna's Motion to Strike Certain Evidence Designated by Plaintiff in Opposition to Defendants' Motion for Summary Judgment; (2) Plaintiff's Motion to Strike Certain Portions of Aetna's Reply Brief in Support of Its Motion for Summary Judgment; (3) Defendants' Motion to Compel Discovery Pursuant to FED. R. CIV. P. 37; (4) Plaintiffs' (sic) Motion to Quash Request to Produce and Permit Inspection of Documents Under Rule 34(C) of Defendants to General Reinsurance Corporation; and (5) Plaintiff's Motion to Compel Discovery.

## I. Summary Judgment Standard

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the party opposing the motion bears the burden of proof at trial on an issue, that party can avoid summary judgment only by setting forth "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

When ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The motion should be granted only if no reasonable jury could return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505.

## II. Background

On November 6, 1992, a van driven by Linda Taylor, a Memorial Health System, Inc. ("Memorial") employee, was involved in a one vehicle accident. Taylor's passengers, Winona McGinnis and Wanda Morris, suffered serious personal injuries. At the time of the accident, Aetna insured Memorial under a policy of business automobile liability insurance with limits of $1,000,000. Memorial also had an umbrella policy issued by PHICO that provided excess insurance coverage of an additional $10,000,000 in limits. PHICO's policy provides in pertinent part:

> the Company [PHICO] shall have the right to associate with the **insured** or the underlying insurer in the defense of any **claim** or proceeding for which coverage may be afforded by this policy and to make such investigation relative to any such **claim** or proceeding as it deems expedient.

(PHICO's Ex. G. at 1.) (Emphasis in original). Coverage under the liability policies for the claims of Taylor's passengers, McGinnis and Morris, turned on whether they were employees of Memorial with an exclusive remedy under the Workers' Compensation Statute or, rather, independent contractors free to sue Memorial and Taylor in a claim insured by the Aetna and PHICO policies.

On April 15, 1993, Aetna filed a declaratory judgment action to resolve this question, naming PHICO as a third party defendant. Morris and her husband sued Memorial, alleging that Memorial was liable for Taylor's alleged negligence in the operation of her vehicle. The Morris case was consolidated with the pending declaratory judgment action for discovery and pretrial matters. McGinnis and her husband also sued Memorial and Taylor. Unlike the Morris case, McGinnis' claim was filed in a different court and was not di-

rectly linked with the declaratory judgment action.

Pursuant to its obligations under the Aetna Policy, Aetna retained Robert T. Sanders, III as defense counsel for Memorial and Taylor in the lawsuits brought by McGinnis and Morris. On December 23, 1994, Sarang Honap, an Aetna claim representative, wrote David Mallon, an attorney representing PHICO, reporting, "Our investigation sofar [sic] indicates that the total damage value of the above mentioned claimants may well exceed our limits." (Ericson Dep. at 16–17, Ex. 2749.) Mallon sent this report on to PHICO. On January 9, 1995, Honap wrote Mallon again, stating, "In regards to Winona McGinnis I am enclosing a copy of the report from Paul M. Deutsch dated October 7, 1994 and a copy of the review of this report done by our Home Office Consultant, Jim Urso. Philco [sic] Insurance Company may want to consider this in their evaluation." (Honap Dep. at 55, Ex. 6803.)

Over the next several months, Aetna and Sanders communicated in writing with PHICO and its attorneys regarding the status of the McGinnis case (the Morris case remained dormant awaiting resolution of the declaratory judgment action). PHICO was in direct contact with Sanders, too. On January 24, 1995, R. Peter Ericson, PHICO's assistant general counsel, contacted Aetna regarding his understanding of PHICO's likely exposure under the McGinnis claim and demanding information from Honap:

> It is ... my understanding that the case may will [sic] have a value which exceeds the $1,000,000 limit of the hospital's automobile liability policy with Aetna.
>
> In light of the potential exposure in excess of the Aetna policy limit, I demand that you immediately supply me with a status report on this matter. This report should contain a summary of all discovery taken in the case, a list of the plaintiff's expert witnesses together with summaries of their opinions and a

list of all witnesses being present on behalf of Memorial Health Systems together with summaries of their opinions. (Ericson Dep. at 19, Ex. 2743) (emphasis added). On February 3, 1995, Sanders responded—at Honap's request—to Ericson's request for information, providing Ericson with a summary of the status of the McGinnis case, which Ericson sent on to Bill Manley, a PHICO claims manager.

In a February 7, 1995, file memorandum, Lynne Kuhns, a PHICO claims professional, reported "I asked Bob [Sanders] what he felt a probable jury award would be and he estimated $1.5 to $2 million." (Kuhns Dep. at 74–76, Ex. 2728.) On February 10, 1995, Honap wrote Kuhns, again reporting that Aetna believed that the McGinnis claims would implicate PHICO's excess coverage. On February 20, 1995, Kuhns submitted a claim to General Re Services Corporation ("Gen Re"), PHICO's reinsurer for claims arising under the PHICO Policy reporting that PHICO had potential exposure in the McGinnis case. On February 24, 1995, Carol A. Seaton, a Gen Re claims representative, wrote back, with her analysis of the Morris and McGinnis claims, indicating that *"Winona McGinnis' claim may have a settlement value as high as $1,700,000, or more, and Wanda Morris' claims may have a settlement value as high as $350,000 or more."* (*Id.* at 88–99, Ex. 2695) (emphasis added).

On March 3, 1995, the court in the McGinnis case entered a scheduling order setting the trial date for August 8, 1995. The scheduling order directed McGinnis to identify testimonial accident reconstruction witnesses and economic witnesses and serve their written reports on or before May 1, 1995 and Memorial to name its experts and serve reports on these subjects by June 2, 1995. On March 7, 1995, Binion prepared a file memo regarding the McGinnis case in which she stated, "This is a case that we will undoubtly [sic] be paying some dollars on." (Binion Dep. at 30, Ex. 2658.) Later that month, Sanders sent a copy of this scheduling order to

Linda Binion, a PHICO litigation specialist assigned to the case.

On May 1, 1995, Sanders sent Binion the expert witness submissions that McGinnis had submitted. In the cover letter to Honap, Sanders noted, "It is my understanding that you [Honap] will review this matter with representatives of Phico and Linda Sue Taylor's personal lines carrier for the purpose of determining whether we should obtain contrary expert evidence." (Binion Dep. at 39, Ex. 2533.) In fact, Honap and Sanders solicited PHICO's input regarding decisions with respect to "obtaining contrary expert testimony" to McGinnis' expert witnesses. (*Id.* at 39–60, Exs. 2538, 2535, 2532; Honap Dep. at 72–76, Exs. 2538, 6543, 2532.)

On May 4, 1995, Binion prepared a summary for Manley regarding the status of the matter, again observing, *"This is a case of clear liability."* (Binion Dep. at 43, Ex. 2603 (emphasis added)). She concluded:

> The plaintiff's [sic] have done a good job working the case and getting it ready for trial. So far, Aetna has not engaged any experts to contradict any of the plaintiffs [sic] damages, or have the plaintiff evaluated in any way. *Therefore, a letter has been directed to the [sic] Aetna outlining several activities for them to perform immediately, or we may take the position that we have been unduly prejudiced from appropriately evaluating the case.* In the alternative, we will provide them the opportunity to tender their limits to us, and we will proceed with the defense.

(*Id.* (emphasis added)). Binion proposed that PHICO send Aetna a letter directing Aetna to take the actions described in the passage above or, alternatively, request that Aetna tender its policy limits to PHICO.

Regarding the Morris claim, on May 9, 1995, Richard Smikle, an attorney of the law firm of Ice, Miller, Donadio & Ryan, who PHICO had retained in February 1995, wrote Wendell Davis, Morris' attorney, regarding settlement. Smikle admits that he "began reviewing file materials from these bodily injury cases on or about the 7th day of February, 1995." (PHICO's Ex. J at 1, ¶ 5.) On March 3, 1995, Marilyn Beblay, a registered nurse, provided Smikle with a detailed 14–page single-spaced summary of the status of McGinnis' condition and the evidence that had been provided in support of McGinnis' case, which Ice Miller provided to Binion. On April 28, 1995, McGinnis' attorney sent Smikle a copy of McGinnis' economic expert's report, following up on their telephone conversation, which Smikle sent on to Binion on May 1, 1995.

Meanwhile, on May 17, 1995, Honap wrote Binion again,

> I have been unable to reach you by phone. As you know, this case has been rescheduled for trial beginning August 8, 1995. As you know, [Sanders] is defending our common insured in this case. From the correspondence on my file, I see that we have supplied you copies of our investigative and damage files. In case you need actual transcripts of depositions you can get those from Mr. Sanders. *The total damage value of the claims in this case is expected to exceed our liability limits.*
>
> Mr. Sanders has discussed with me of retaining Barker & Herbert as accident reconstruction experts in this case. *Do you have any other preference? In regards to the damage issue we feel that hiring an economist may not be to our advantage. Because such an expert may just confirm what plaintiff's expert has to say. But your company may want to reconsider this issue. Please feel free to call or write at any time....*

(Binion Dep. at 59, Ex. 2535) (emphasis added); Kuhns Dep. at 148–151, Ex. 2536 (emphasis added.) On May 22, 1995, Binion received another letter from Sanders to Honap, in which Sanders noted, "If we intend to obtain independent expert testimony in this matter, I will probably be

required to seek an order for additional time for that purpose, and I would therefore appreciate your advice in that matter as soon as possible." (Binion Dep. at 60, Ex. 2532.) Aetna retained an accident reconstruction expert but no economic experts were retained to testify for the defense at trial.

On June 29, 1995, four weeks after the deadline for identifying expert witnesses had passed, Binion wrote Honap "strongly suggesting" that Aetna retain several experts, including an economist, an accident reconstructionist, and a life planner and instructing Aetna to perform an independent medical examination and surveillance of McGinnis or, in the alternative, requesting that Aetna tender its policy limits to PHICO. (*Id.* at 63, Ex. 6507.) On July 7, 1995, Sanders wrote Binion, also responding to Binion's June 29, 1995 letter to Honap:

> You will recall that these matters were addressed previously in my letter to R. Peter Erickson of Phico dated February 3, 1995, and throughout this process, we have solicited the opinion of Phico with respect to the retention of experts and other trial matters. I have heard nothing from you regarding any of those matters until receiving a copy of your letter to Mr. Honap, and we have therefore proceeded on the basis of the earlier reports, recommendations and status summaries, all of which were provided to you contemporaneously with the occurrence of those events.

(*Id.* at 66, Ex. 2508).

On July 17, 1995, the St. Joseph Circuit Court decided the declaratory judgment action, holding that McGinnis and Morris were independent contractors, not Memorial's employees. Shortly thereafter, on July 21, 1995, Aetna notified Binion that Aetna would tender its $1,000,000 policy limits to PHICO as requested. PHICO immediately replaced Sanders with Smikle as trial counsel for Memorial.

McGinnis' attorney offered to settle the case for over 13 million dollars. On July 28, 1995, Memorial's attorney, Doug Small, wrote Kuhns, directing PHICO to settle the case within PHICO's policy limits prior to trial. The parties then conducted a mediation in the McGinnis case on August 1, 1995.

On August 3, 1995, Kuhns wrote Small, asserting that PHICO was "not responsible for the conduct of the defense of the [McGinnis case] by Aetna" and that PHICO's obligations were "limited to the duty to cooperate in the defense of the [McGinnis] claim" prior to Aetna's tender of the defense to PHICO. (Kuhns Dep. at 258–259, Ex. 999.) Kuhns also reported that the mediator, Judge Sanford Brook, "indicated that in his opinion a reasonable settlement of the case would be in the range of $4.6 million to $5.7 million" based on Judge Brook's examination of jury verdicts in St. Joseph County for comparable injuries. (*Id.* at 261, Ex. 999.) Memorial and its attorney recommended settling McGinnis case for $5,800,000. Later in August 1995, PHICO settled the McGinnis claims for $5,800,000—with Memorial's consent and approval. The Morris case settled several months after the McGinnis case was resolved.

PHICO now claims it was "handicapped in final negotiations" by the alleged negligence described above because McGinnis' and Morris' claims "were enhanced by defendant's unreadiness for trial." (PHICO's Contentions at 2.) PHICO contends that it was "forced" to settle the case before trial "for the protection of the insureds against a runaway verdict" and that it settled the personal injury claims for a sum "in excess of the fair and reasonable value of the claims—had the defense of those claims been reasonably prepared for trial." (*Id.*)

### III. Discussion of Aetna's Motion for Summary Judgment

Aetna moves for summary judgment on PHICO's Complaint. It contends that PHICO is not entitled to bring claims

based upon equitable subrogation because such claims are cognizable only when the primary carrier wrongfully refuses to settle an underlying action within the primary's policy limits. Aetna contends that it owed PHICO no duty of care as no direct duty of care runs between a primary and excess carrier. Aetna also argues that PHICO's claims are barred by the equitable defenses of laches, waiver and estoppel and under the doctrine of unclean hands.[2]

■ A federal court sitting in diversity must attempt to resolve the issues before it as would the highest court of the state that provides the applicable law. *Stephan v. Rocky Mountain Chocolate Factory, Inc.*, 129 F.3d 414, 416–17 (7th Cir.1997); *Allen v. Transamerica Ins. Co.*, 128 F.3d 462, 466 (7th Cir.1997). If the highest court has not provided clear guidance on an issue, then the court must exercise its best judgment to predict how the court would decide that issue. *Id.* This case is governed by the substantive law of the state of Indiana. The Indiana Supreme Court has not provided clear guidance on the issues presented by Aetna's motion. Therefore, this court must exercise its best judgment to predict how that court likely would decide these issues.

■ No court applying Indiana law has held or even intimated that a primary insurer owes a direct duty of care to the excess insurer. A few cases from other jurisdictions have suggested that such a duty exists, *see Hartford Accident & Indem. Co. v. Michigan Mut. Ins. Co.*, 93 A.D.2d 337, 462 N.Y.S.2d 175, 178–79 (N.Y.A.D.1983), *aff'd*, 61 N.Y.2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608 (1984); *Estate of Penn v. Amalgamated Gen. Agencies*, 148 N.J.Super. 419, 372 A.2d 1124, 1127 (1977); *Western World Ins. Co. v. Allstate Ins. Co.*, 150 N.J.Super. 481, 376 A.2d 177, 180 (1977), but the majority of jurisdictions describe the duty owed by the primary insurer to the excess insurer as derivative from that owed to the insured. *See, e.g., Twin City Fire Ins. Co. v. Country Mut. Ins. Co.*, 23 F.3d 1175, 1178 (7th Cir.1994) (citing cases); *American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 482–83 (Tex.1992). PHICO has given this court no reason to believe that the Indiana courts would not follow the majority. As noted in *Certain Underwriters of Lloyd's v. General Acc. Ins. Co.*, 909 F.2d 228 (7th Cir.1990) (*"Certain Underwriters II "*), "Indiana courts look to national trends for guidance on insurance issues of broad application ...." *Id.* at 233. In fact, the *Certain Underwriters II* court concluded there is no direct duty running from the primary insurer to the excess insurer. *See id.* at 232–33; *see also Certain Underwriters of Lloyd's v. General Acc. Ins. Co.*, 699 F.Supp. 732, 737 (S.D.Ind.1988) (*"Certain Underwriters I "*) (concluding that Indiana would follow the national trend and allow excess insurer to sue under doctrine of equitable subrogation), *aff'd*, 909 F.2d 228 (7th Cir.1990). Therefore, the court rejects PHICO's claim of a direct duty running from Aetna to PHICO.

■ Aetna correctly points out that excess insurers have been allowed to assert claims against the primary insurer under equitable subrogation for actions alleging bad faith or negligent failure to settle an underlying tort action within the primary's policy limits. *See, e.g., Westchester Fire Ins. v. General Star Indem.*, 183 F.3d 578, 580 (7th Cir.1999); *Twin City Fire Ins. Co.*, 23 F.3d at 1177–78; *Certain Underwriters*, 909 F.2d at 232. Nothing in these decisions limited the right of equitable subrogation to failure to settle claims, however, and other courts have recognized an excess insurer's right to maintain an equitable subrogation action against the primary insurer for negligent handling and defense of a claim. *See, e.g., Allstate Ins.*

---

**2.** Aetna advances other arguments why summary judgment should be granted in its favor, but the court need not reach them here.

*Co. v. American Transit Ins. Co.* 977 F.Supp. 197, 200–201 (E.D.N.Y.1997); *Western Alliance Ins. Co. v. Northern Ins. Co. of New York*, 968 F.Supp. 1162, 1169–70 (N.D.Tex.1997), *vacated on other grounds by*, 176 F.3d 825 (5th Cir.1999); *American Centennial Ins. Co.*, 843 S.W.2d at 483; *Hartford Acc. & Indem. Co.*, 462 N.Y.S.2d at 178–79; *cf. National Union Ins. Co. v. Dowd & Dowd, P.C.*, 2 F.Supp.2d 1013, 1021–22 (N.D.Ill.1998) (interpreting *New Amsterdam Cas. Co. v. Certain Underwriters at Lloyds, London*, 34 Ill.2d 424, 216 N.E.2d 665 (1966), as supporting the recognition of an excess liability insurer's right to assert an equitable subrogation claim against the primary liability insurer).

In *Certain Underwriters II*, the Seventh Circuit explained that sound policy reasons supported finding a cause of action by an excess insurer against a primary insurer for bad faith or negligent failure to settle within the primary's policy limits. The court said:

> When the insured purchases excess liability coverage, it protects itself from the possibility of a judgment above the limits of its primary coverage. The excess insurer, instead, faces the hazard that the primary insurer will refuse to settle the case within the primary limits. The primary insurer's duty to act with due care and in good faith does not disappear simply because the insured purchased excess insurance. The insured's premiums for excess insurance are substantially lower than those paid for primary insurance because the probability of reaching the excess coverage is similarly lower; should the primary's duty of good faith evaporate with the purchase of excess coverage, thus in-

creasing the probability of an excess judgment, the insured's excess premiums would correspondingly increase. Thus sound policy reasons exist for recognizing an excess insurer's cause of action against a primary insurer for bad faith or negligent refusal to settle within policy limits.

*Certain Underwriters II*, 909 F.2d at 232. True, the court discussed these policy reasons in the context of a failure to settle claim. But the primary insurer's duty owed the insured to act with due care and in good faith is not limited to settlement. Rather, the duty encompasses the defense and handling of the claim as well. Thus, these same policy reasons apply equally to an excess insurer's action against a primary insurer for bad faith or negligent defense of a claim against the insured. *See Home Ins. Co. v. Three I Truck Line, Inc.*, NO. 98 C 7343, 1999 WL 753947, at *1–2 (N.D.Ill. Sep.17, 1999) (insured's action against primary insurer for bad faith in handling litigation and refusing to entertain post-trial settlement within policy limits), *as amended*, 1999 WL 965721 (N.D.Ill. Sep.29, 1999). The court therefore predicts that the Indiana Supreme Court would recognize a cause of action by an excess insurer against a primary insurer under equitable subrogation for bad faith or negligent defense of a claim against the insured.

The issue, then, becomes, whether PHICO can maintain such an action against Aetna given the facts of this case. Consideration of the rationale underlying equitable subrogation and equitable principles, including laches, waiver, and the doctrine of unclean hands, leads to the conclusion that it should not.[3]

---

**3.** Aetna also contends that equitable estoppel bars PHICO's claims; however, the court disagrees that this doctrine applies to the facts of this case. The record does not support a finding that any act of PHICO was calculated to mislead Aetna. *See Lafayette Car Wash, Inc. v. Boes*, 258 Ind. 498, 282 N.E.2d 837, 840 (1972) (stating that "[t]o create an estoppel, the words or conduct of the party es-

topped must be calculated to mislead the other party ...."); *Jackson v. DeFabis*, 553 N.E.2d 1212, 1218 (Ind.Ct.App.1990); *O.K. Sand & Gravel v. Martin Marietta Corp.*, 819 F.Supp. 771, 783 (S.D.Ind.1992), *aff'd sub nom., O.K. Sand & Gravel, Inc. v. Martin Marietta Tech., Inc.*, 36 F.3d 565 (7th Cir. 1994).

■ The rationale for applying the doctrine of equitable subrogation in favor of excess insurers and against primary insurers is to prevent injustice and to shift the economic burden to the party responsible for the loss. *See National Union Ins. Co. v. Dowd & Dowd, P.C.*, 2 F.Supp.2d 1013, 1020–21 (N.D.Ill.1998). A corollary to this is that an excess insurer should not be allowed to recover against a primary insurer under the doctrine of equitable subrogation where such recovery would be inequitable and unjust. *See id.* at 1021–22. To allow PHICO to recover against Aetna given the facts and circumstances of this case would be inequitable and unjust.

It is undisputed that PHICO was well aware of the underlying tort actions against Memorial and Taylor and understood at least as early as January 1995 that the claims exceeded Aetna's policy limits, thus implicating PHICO's policy. In fact, everyone involved—PHICO, Aetna, Memorial and even Gen Re, PHICO's reinsurer—understood that the underlying bodily injury claims would exceed Aetna's policy limits. Because of this, only PHICO had the ability to settle the underlying claims. Further, the undisputed evidence establishes that both Memorial and Aetna sought PHICO's participation and input in the defense of the insureds, Memorial and Taylor, because the underlying claims clearly implicated PHICO's excess coverage. Even if they hadn't, it is undisputed PHICO had the express right, under its contract with Memorial, to participate in the insureds' defense; yet, PHICO simply chose not to participate in that defense until Aetna tendered its policy limits.

■ More particularly, as early as March 1995, PHICO had the scheduling order which set June 2, 1995, as the expert deadline for Memorial in the McGinnis case. In early May 1995, PHICO had McGinnis's expert witness submissions and had a copy of McGinnis' economic expert's report. Also at that time, PHICO understood that Aetna had not obtained any experts to contradict McGinnis' damages

and had not had Ms. McGinnis independently evaluated. PHICO also had been provided copies of Aetna's investigative and damage files. In addition, Aetna and Sanders solicited PHICO's input on decisions with respect to securing expert testimony. PHICO was aware, from the May 17, 1995, letter from Honap to Binion, that Aetna did not intend to retain an economist because it did not believe that would be to its advantage. Aetna, however, had invited PHICO to reconsider the issue. In addition, on May 22, PHICO was advised that if independent expert testimony was needed, Sanders would have to seek additional time within which to do so. PHICO did not make its concerns about the lack of experts and an independent medical examination and surveillance of McGinnis known until June 29—approximately four weeks after the expert deadline had passed. Given these facts, to allow PHICO to recover against Aetna would be inequitable and unjust.

■ Moreover, PHICO's claims against Aetna are barred by the affirmative equitable defense of laches. "No principle of equity jurisprudence is better established or more familiar than that 'equity aids the vigilant, not those who slumber on their rights.'" *Koons v. Blanton,* 129 Ind. 383, 27 N.E. 334, 336 (1891); *see also Hellyer Communications, Inc. v. WRC Properties, Inc.,* 969 F.Supp. 1150, 1159 (S.D.Ind.1997); *Alber v. Standard Htg. & Air Cond., Inc.,* 476 N.E.2d 507, 509 (Ind.Ct.App.1985). Laches "bars a party's rights when the party has unreasonably delayed their assertion so as to cause prejudice to the opposing party." *Hutchinson v. Spanierman,* 190 F.3d 815, 822–23 (7th Cir.1999). Laches has been defined by the Indiana Supreme Court as "neglect for an unreasonable or unexplained length of time, under circumstances permitting diligence, to do what in law should have been done." *Williams v. State,* 716 N.E.2d 897, 901 (Ind.1999) (quotation omitted). Laches has three elements: "inexcusable delay in asserting a

right; implied waiver from knowing acquiescence in existing conditions; and circumstances resulting in prejudice to the adverse party." *In re Siegel*, 708 N.E.2d 869, 871 (Ind.1999); *see also In re Geisler*, 614 N.E.2d 939, 940 (Ind.1993); *In re Paternity of K.H.*, 709 N.E.2d 1033, 1036 (Ind.Ct.App.1999).

PHICO contends that laches involves questions of fact and therefore should not be resolved on summary judgment. Neither *Ball v. Indiana Dep't of Revenue*, 563 N.E.2d 522 (Ind.1990), nor *Habig v. Bruning*, 613 N.E.2d 61 (Ind.Ct. App.1993), upon which PHICO relies, stands for the proposition that a court cannot decide whether laches bars a claim when the underlying facts are undisputed. Rather, in each of those cases there were disputed facts as to an element of the laches defense. Not so here. Summary judgment may be appropriately granted where there are no genuine issues of material fact as to the laches defense. *See E.E.O.C. v. Indiana Bell Tel. Co.*, 641 F.Supp. 115, 117–18 (S.D.Ind.1986).

The affirmative defenses of laches bars PHICO's claims against Aetna. PHICO was not vigilant; instead, it slumbered on its rights. PHICO argues that it had no right to control the defense of the insureds or any duty to intervene until Aetna tendered its policy limits. This argument is rejected. PHICO had the right, pursuant to its contract with Memorial, to associate with Memorial and Aetna and to participate in the defense of the underlying tort claims. Despite this right, PHICO waited in the wings, electing not to participate in the defense of the insureds until it was too late. PHICO's delay in asserting this right was inexcusable because PHICO knew full well that its policy was implicated by the underlying claims. PHICO had been informed of Aetna's defense strategy—at the least, PHICO knew which experts Aetna had identified and those it did not—but PHICO chose not to assert its right to identify and retain experts on damages until the deadline for identifying experts had passed.

PHICO's knowing acquiescence in Aetna's defense of the insureds and its failure to identify experts or object to the defense constitutes an implied waiver of its right to object to the defense and lack of certain experts. PHICO's argument that Aetna has not shown any resulting prejudice is rejected. PHICO, Aetna, and Memorial had a shared interest in the defense of Memorial. PHICO inexplicably failed to do what it should have done under the circumstances known to it. PHICO did not look out for its own interests where those interests diverged from Aetna's. Aetna was working against the threat of expert witness disclosure deadlines without assistance from a fully informed PHICO—and the potential for damages well in excess of $1 million was PHICO's concern, not Aetna's. Nonetheless, PHICO failed to instruct Aetna in a way to sufficiently guard against an escalated damages award. As a result, Aetna was forced to defend the damage issue in a way which was realistic to its economic interests. PHICO's inattentiveness to the large damage potential in these cases placed Aetna in harm's way on the damage issue. If Aetna lost on the liability question—which was inevitable if the independent contractor/employee question efforts by Aetna failed—it was facing a judgment certain to exceed its policy limits. Efforts by Aetna to minimize the damage loss would accrue only to PHICO, with no benefit to Aetna, and no cost contribution by PHICO for such efforts. It appears that PHICO took the same gamble that Aetna did—that McGinnis and Morris would be covered by worker's compensation—and lost. PHICO unfortunately had more at stake than Aetna did.

PHICO argues that the court in *Certain Underwriters I* concluded that inaction was insufficient to support application of the doctrines of equitable estoppel and laches because of a lack of affirmative misleading conduct and prejudice. *See*

*Certain Underwriters I,* 699 F.Supp. at 741. It argues that the principles and results are the same with respect to the doctrines of waiver and unclean hands. In reaching its conclusion, however, the court observed that affirmative, misleading conduct is an element of estoppel. *See id.* Such conduct is not an element of laches, waiver or unclean hands. In addition, in contrast with *Certain Underwriters I,* Aetna has demonstrated prejudice caused by PHICO's acquiescence. Therefore, *Certain Underwriters I* does not direct a result contrary to that reached here.

 Furthermore, PHICO's claims against Aetna are barred by the affirmative defense of waiver. "Waiver is an intentional relinquishment of a known right." *Gallant Ins. Co. v. Allstate Ins. Co.,* 723 N.E.2d 452, 455–56 (Ind.App.2000); *see also Lafayette Car Wash, Inc. v. Boes,* 258 Ind. 498, 282 N.E.2d 837, 839–40 (1972); *Pohle v. Cheatham,* 724 N.E.2d 655, 658–59 (Ind.App.2000). Waiver requires knowledge of the existence of the right and the intent to relinquish it. *See Pohle,* 724 N.E.2d 655, 658–59; *Corrigan v. Al–Trim Corp.,* 700 N.E.2d 481, 484 (Ind.Ct.App. 1998), *trans. denied.* "[W]aiver may be shown either by express or implied consent, and, thus, the right may be lost by a course of conduct which estops its assertion." *Pohle,* 724 N.E.2d 655, 658–59 (citation omitted). Mere silence, acquiescence or inactivity does not constitute waiver unless there was a duty to speak or act. *See Pohle,* 724 N.E.2d 655, 658–59; *Richardson v. State,* 456 N.E.2d 1063 (Ind.Ct. App.1983); *accord Union Auto. Indem. Ass'n v. Shields,* 79 F.3d 39, 42 (7th Cir. 1996).

 PHICO was well aware of its contractual right to participate in the defense of the insureds. Though it disclaims any right to control Memorial's defense until Aetna tendered its policy limits, it makes no such disclaimer with respect to its right to participate in the defense before Aetna's tender. PHICO's waiver is demonstrated by its implied consent and course of conduct in failing to take any action in defense of the insureds and, specifically, in failing to object to Aetna's defense as it related to expert witnesses. PHICO's acquiescence in Aetna's litigation strategy constitutes waiver because PHICO had a duty to speak up to protect its own interests and that of the insured if it objected to that strategy.

 As the excess insurer, PHICO owed Memorial a duty—a duty of care if not a duty to defend—once it understood that Aetna's policy limits would be exhausted by the underlying claims. *See, e.g., Liberty Mut. Ins. Co. v. Travelers Indem. Co.,* 78 F.3d 639, 645 (D.C.Cir. 1996); *Hocker v. New Hampshire Ins. Co.,* 922 F.2d 1476, 1484–85 (10th Cir.1991); *American Family Life Assurance Co. v. United States Fire Co.,* 885 F.2d 826, 836–37 (11th Cir.1989); *Cooper Lab., Inc. v. International Surplus Lines Ins. Co.,* 802 F.2d 667, 676 (3rd Cir.1986). This duty of care is not contingent upon tender of the policy limits by the primary insurer, provided the excess insurer is on notice that the primary's limits will be exhausted. *See, e.g., Belmer v. Nationwide Mut. Ins. Co.,* 157 Misc.2d 845, 599 N.Y.S.2d 427, 432 (N.Y.Sup.1993); *Celina Mut. Ins. Co. v. Citizens Ins. Co.,* 133 Mich.App. 655, 349 N.W.2d 547, 550–51 (1984).

True, *Certain Underwriters I* contains language stating that "an excess carrier owes no duty to the insured nor to the primary carrier to defend the insured or to enter into settlement negotiations." *Certain Underwriters I,* 699 F.Supp. at 740. But this statement must be understood in the factual context in which it was made. There was no hint in *Certain Underwriters I* that the policy limits of the primary insurer, General Accident Insurance Company ("General Accident"), would be exhausted until trial of the underlying claims had commenced. In fact, General Accident believed that the underlying claims could be settled for its policy limits. *See Certain Underwriters II,* 909 F.2d at 229–

30. In the instant case, everyone was well aware from the beginning that Aetna's policy limits would be exhausted. Moreover, General Accident did not keep Certain Underwriters, the excess insurer, apprised of the underlying litigation and defense strategy, *see id.; Certain Underwriters I*, 699 F.Supp. at 733–34, as Aetna did here. In addition, neither General Accident nor the insured solicited Certain Underwriters' input regarding the defense, which is another significant difference from the instant case. *See id.* Because of the vastly different facts and circumstances between *Certain Underwriters I* and the instant case, the above quoted language from *Certain Underwriters I* is not extended to the situation here. To the extent this language suggests an excess insurer owes no duty to the insured until the primary insurer's policy limits are exhausted, the undersigned respectfully disagrees with that suggestion.

Factual differences also distinguish *Ryder Truck Lines, Inc. v. Carolina Casualty Ins. Co.*, 270 Ind. 315, 385 N.E.2d 449 (1979), and *Western Alliance v. Northern Ins. Co.*, 968 F.Supp. 1162 (N.D.Tex.1997), upon which PHICO also relies in support of its argument that it had no duty until Aetna tendered its policy limits. The excess insurer's coverage was not implicated by the underlying claim against the insured in either case. *See Western Alliance*, 968 F.Supp. at 1165–66; *Ryder Truck Lines*, 385 N.E.2d at 452.

Even if PHICO had no duty to defend Memorial until Aetna tendered its policy limits, it owed Memorial a duty of care because it knew full well early on in the litigation of the underlying tort claims that its policy would be implicated by those claims. In light of this duty owed Memorial, PHICO had a corresponding duty to speak up if it viewed Aetna's defense of Memorial as inadequate. Thus, PHICO's acquiescence in Aetna's defense of the insureds constitutes waiver of any right to object to that defense.

■ The doctrine of unclean hands is yet another barrier that PHICO cannot surmount. "One who comes before a court in equity must do so with clean hands." *Lake County Trust Co. v. Wine*, 704 N.E.2d 1035, 1042 (Ind.Ct.App.1998); *see also Tomahawk Village Ap'ts. v. Farren*, 571 N.E.2d 1286, 1294 (Ind.App.1991). For the doctrine of unclean hands to apply, the party charged with having unclean hands must be guilty of intentional misconduct. *Id.; Wagner v. Estate of Fox*, 717 N.E.2d 195, 202 (Ind.Ct.App.1999). The doctrine is not favored and is applied by courts with reluctance. *See, e.g., Wagner*, 717 N.E.2d at 202. PHICO contends that the doctrine does not bar its claims because there is no evidence that it is guilty of intentional misconduct. The court disagrees.

■ The "intentional misconduct" necessary for application of the doctrine under Indiana law need not rise to conduct of a criminal nature. Rather, it seems that the failure to do that which one has an affirmative duty to do satisfies the element of misconduct. *See Lake County Trust Co.*, 704 N.E.2d at 1042 (parties intentionally breached the terms of a lease); *Tomahawk Village Ap'ts*, 571 N.E.2d at 1294 (party did not engage in intentional misconduct where its failure to pay amounts due was not willful or negligent). PHICO had both the right and duty to participate in Memorial's defense before Aetna tendered its policy limits, but PHICO did not. In light of this duty, PHICO's decision not to participate in the defense amounts to misconduct and the record establishes that such conduct was intentional. The conclusion that PHICO's action against Aetna is barred by the doctrine of unclean hands finds support in the decision of *Hocker v. New Hampshire Ins. Co.*, 922 F.2d 1476, 1486 (10th Cir.1991) (affirming dismissal of excess insurer's equitable subrogation claim against primary insurer under doctrine of unclean hands; applying Wyoming law).

As discussed, PHICO does not come to this court wholly without blame. Though courts reluctantly apply the doctrine of unclean hands to bar a party's claim, the court finds that in this case, application of the doctrine is appropriate. Aetna should not bear the cost of PHICO's failure to protect its own rights and interests. PHICO's claims are barred under the doctrine of unclean hands.

"All rules in equity are sufficiently elastic to permit justice and equity to be done in each particular case." *Mishawaka–St. Joseph Loan & Trust Co. v. Neu*, 209 Ind. 433, 196 N.E. 85, 90 (1935). Justice and equity dictate that PHICO not prevail against Aetna in this case.

## IV. Other Pending Motions

PHICO filed two separate motions for partial summary judgment. With the first, PHICO seeks partial summary judgment on Aetna's Twelfth Affirmative defense, which asserts that PHICO and the insureds were negligent. With the second, PHICO seeks partial summary judgment on Aetna's liability for the conduct of attorney Robert T. Sanders, III, in his representation of the Defendants' insured, Memorial. Because the court has concluded that Aetna should be granted summary judgment, the court need not reach PHICO's motions for partial summary judgment. These motions are, therefore, **DENIED.** Similarly, the court's ruling on Aetna's motion for summary judgment renders all other pending motions moot, and the same will be **DENIED AS MOOT.**

## V. Conclusion

For the foregoing reasons, Aetna's motion for summary judgment will be **GRANTED;** PHICO's motions for partial summary judgment need not be reached and, therefore, are **DENIED;** and all other pending motions—Aetna's Motion to Strike Certain Evidence Designated by Plaintiff in Opposition to Defendants' Motion for Summary Judgment; Plaintiff's Motion to Strike Certain Portions of Aetna's Reply Brief in Support of Its Motion for Summary Judgment; Defendants' Motion to Compel Discovery Pursuant to FED. R. CIV. P. 37; Plaintiffs' (sic) Motion to Quash Request to Produce and Permit Inspection of Documents Under Rule 34(C) of Defendants to General Reinsurance Corporation; and Plaintiff's Motion to Compel Discovery—are **DENIED AS MOOT.**

Final judgment will be entered in accordance with this Entry.