QUERREY & HARROW, LTD., James N. Kosmond, Gretchen Cepek, Sanders Pianowski, LLP and Robert A. Sanders, individually, Appellants–Defendants,

v.

TRANSCONTINENTAL INSURANCE COMPANY, Appellee–Plaintiff.

No. 45A03–0601–CV–36.

Court of Appeals of Indiana.

Feb. 19, 2007.

Robert D. Brown, Merrillville, IN, James J. Stamos, George M. Hoffman, Chicago, IL, Edward W. Hearn, Highland, IN, Attorneys for Appellants.

Terrence M. Rubino, Dyer, IN, Gary A. Grasso, Heather Higgins Alderman, Burr Ridge, IL, Attorneys for Appellee.

## OPINION

HOFFMAN, Senior Judge.

Defendants–Appellants Querrey & Harrow, Ltd. ("the Querrey firm"); James N. Kosmond ("Kosmond"); Gretchen Cepek ("Cepek"); Sanders Pianowski, LLP ("the Sanders firm"); and Robert A. Sanders, individually ("Sanders") appeal the trial court's denial of their respective motions for summary judgment in a suit filed by Plaintiff–Appellee Transcontinental Insurance Company ("CNA"). Both the Sanders firm and the Querrey firm were hired to represent Jumpking in a product liability action filed in the Elkhart Circuit Court ("the underlying litigation"). In the instant case, CNA filed suit against the two firms and the individual attorneys for legal malpractice. We reverse and remand with instructions.

Defendants–Appellees raise numerous issues, which we consolidate as:

I. Whether the trial court erred in holding that Indiana allows an excess insurer to bring an action for legal malpractice against an insured's attorneys.

II. Whether the trial court erred in holding there was a genuine issue of material fact as to whether an attorney-client relationship existed between the insured's attorneys and CNA.

III. Whether CNA's legal malpractice action was timely filed.

The underlying litigation was initiated by Buicky Boriboune and his mother, Phith, as a result of injuries Buicky suffered while using a trampoline manufactured by Jumpking. The Boribounes filed a product liability suit against Jumpking, and the parties reached a settlement which required Jumpking to pay the Boribounes $6,300,000. Jumpking, owned by ICON Health & Fitness, Inc., was self-insured for the first $250,000 of liability. Its primary liability insurer was Liberty Mutual Insurance Company, which provided the first layer of coverage in the amount of $5,000,000. Due to erosion in coverage, however, Liberty Mutual had less than $3,000,000 available for the Boribounes' claim. As the excess insurer, CNA provided excess coverage in the amount of $10,000,000, and it contributed $3,740,000 to the settlement.

CNA subsequently filed a complaint claiming that had the attorneys from the Querrey and Sanders firms timely raised a non-party defense, the underlying litigation would have been settled for or a verdict would have been reached that was significantly less than $6,300,000.[1] CNA

---

1. For clarity and brevity, we hereinafter refer to Defendants–Appellants collectively as "Querrey and Sanders."

further claimed that absent Querrey and Sanders' malpractice it would not have had to pay the excess coverage. Querrey and Sanders filed motions for summary judgment that asserted CNA could not bring a claim for legal malpractice. The appeals from the trial court's respective denials of the summary judgment motions have been consolidated.

The purpose of summary judgment is to terminate litigation about which there is no factual dispute and which may be determined as a matter of law. *Ratcliff v. Barnes,* 750 N.E.2d 433, 436 (Ind.Ct.App. 2001), *trans. denied.* When reviewing the grant or denial of summary judgment, this court applies the same standard as the trial court. *Id.* Summary judgment is appropriate only if the designated evidentiary material shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

In performing our analysis, we consider the pleadings and evidence sanctioned by Ind. Trial Rule 56(C) without determining weight or credibility. *Mehling v. Dubois County Farm Bureau Co-op. Ass'n,* 601 N.E.2d 5, 6 (Ind.Ct.App.1992). All doubts about the existence of facts or the reasonable inferences to be drawn therefrom are to be resolved in the nonmovant's favor. *Heck v. Stoffer,* 786 N.E.2d 265, 268 (Ind. 2003). When there are no disputed facts with regard to a motion for summary judgment and the question presented is a pure question of law, we review the matter de novo. *Levy v. Newell,* 822 N.E.2d 234, 236 (Ind.Ct.App.2005), *trans. denied.*

## I.

Querrey and Sanders contend that the trial court erred in determining as a matter of law that CNA, an excess insurer, can bring a legal malpractice action against an insured's attorneys. CNA responds, and the trial court held, that because an excess insurer is subrogated to the rights of its insured, it may recover any damages arising from the malpractice of the insured's attorneys. The parties acknowledge that this is an issue of first impression in Indiana; accordingly, they cite cases from other jurisdictions that support their particular contentions.[2]

As a general rule, a plaintiff may recover against a professional who negligently makes representations or gives advice "only if there is privity of contract or if the negligent professional had actual knowledge that the plaintiff would be affected by the representations made." *Keybank National Association v. Shipley,* 846 N.E.2d 290, 297 (Ind.Ct.App.2006), *trans. denied* (quoting *Walker v. Lawson,* 514 N.E.2d 629, 632 (Ind.Ct.App.1987), *adopted in part by* 526 N.E.2d 968 (Ind. 1988)). Indiana has recognized a single exception to the general rule, allowing a beneficiary under a will to pursue a malpractice claim against the drafter of the will despite lack of privity because "the attorney and testator-client enter[ed] into an agreement with the intent to confer a direct benefit on the beneficiary under the will, allowing the third party to sue on the contract...." *Id.* Recently, in *Keybank,* we reiterated the general rule and noted the narrowness of the exception, concluding that the secured creditor of a failed business could not maintain a legal mal-

**2.** We note that Querrey and Sanders relied heavily on an unreported federal case as support for its contention. "Unless later designated for publication, a not-for-publication memorandum decision shall not be regarded as precedent and shall not be cited to any court except by the parties to the case to establish res judicata, collateral estoppel, or law of the case." Indiana Appellate Rule 65(D). In making our determination in this case, we do not rely on the case improperly cited by Querrey and Sanders.

practice suit against the attorney who had represented a receiver in the business' receivership. *Id.* at 299–300. We emphasized that there are important public policy reasons to keep the privity requirement intact because when "lawyers must be conce[r]ned about their potential liability to third parties, the resultant self-protective tendencies may deter vigorous representation of the client. Attention to third-party risk might cause the attorney improperly to consider 'personal interests' or 'the desires of third parties' above the client's interests. This would contravene the lawyer's duty of loyalty to the client." *Id.* at 300 (quoting Jack I. Samet et al., *The Attack on the Citadel of Privity,* 20 A.B.A. Winter Brief 9, 40 (1991) (footnotes omitted)).

██ Furthermore, public policy concerns dictate that a legal malpractice claim may not be assigned. *Picadilly, Inc. v. Raikos,* 582 N.E.2d 338 (Ind.1991). Assignment of legal malpractice claims "would weaken at least two standards that define the lawyer's duty to the client: the duty to act loyally and the duty to maintain client confidentiality." *Id.*

Understanding the import of our public policy, CNA does not assert its right to sue Querrey and Sanders as a third-party beneficiary. Instead, it asserts that it may recover under the doctrine of equitable subrogation. CNA emphasizes that equitable subrogation is a well-recognized remedy in Indiana, and it cites *Vonderahe v. Ortman,* 128 Ind.App. 381, 147 N.E.2d 924 (1958) for the dual purposes of defining the remedy and of explaining the breadth of its acceptance in Indiana. In *Vonderahe,* this court held that the right of subrogation is founded upon "principles of equity and justice, and includes every instance in which one party, not a mere volunteer, pays debt for another, primarily liable,

which in good conscience should have been paid by the latter." *Id.* at 925.

CNA emphasizes that a claim for equitable subrogation is a derivative action and that CNA should be able to "step[ ] directly into the shoes of Jumpking for the actual amount it paid in fulfilling its insuring contract with Jumpking." Appellee's Brief at 7. CNA argues that Indiana law pertaining to privity and the prohibition against assignment of legal malpractice actions does not pertain to legal malpractice claims pursued under the doctrine of equitable subrogation. CNA further argues that the law should not create a class of special, protected defense attorneys who commit malpractice with impunity.

A number of federal and state courts have addressed the issue of whether an excess insurer may pursue a legal malpractice action against an insured's attorney. A number of jurisdictions have held as a matter of public policy that such an action would interfere with the attorney-client relationship and would run counter to the jurisdiction's prohibition of the assignment of legal malpractice actions. *See e.g., Essex Insurance Co. v. Tyler,* 309 F.Supp.2d 1270, 1274 (D.Colo.2004) (predicting that although Colorado recognizes subrogation to "compel the wrongdoer to bear the ultimate costs," it would not allow an excess insurer to pursue a legal malpractice action against an insured's attorney because such an action would compromise the duty of loyalty to the attorney's client based on the anticipation of "possible legal malpractice claims by third parties"); *Fireman's Fund Insurance Co. et al. v. McDonald, Hecht & Solberg et al.,* 30 Cal. App.4th 1373, 36 Cal.Rptr.2d 424 (1994), *review denied* (holding that because assignment and subrogation have the effect of transferring from one person to another a cause of action against a third, and because the reasons of policy which make

certain causes of action nonassignable "would seem to operate as forcefully against the transfer of such causes of action by subrogation," public policy would not allow insurers to violate the sanctity of the attorney-client relationship by pursuing an action against the insured's attorneys); *National Union Fire Insurance Co. v. Salter,* 717 So.2d 141 (Fla.Ct.App. 1998), *rev. denied* (holding that policy reasons for prohibiting assignment of legal malpractice claims apply to prohibition of subrogation of legal malpractice claims); *American Continental Insurance Co. v. Weber & Rose, P.S.C.,* 997 S.W.2d 12 (Ky. Ct.App.1998), *rev. denied* (holding that "allowing excess insurers to maintain legal malpractice actions against insured's attorneys, based upon theories of equitable subrogation, would undermine this jurisdiction's adherence to a view promoting the preservation of traditional attorney-client relationships"); *American Employers' Insurance Co. v. Medical Protective Co.,* 165 Mich.App. 657, 419 N.W.2d 447 (1988), *appeal denied* (holding that allowing an excess insurer to pursue a legal malpractice action against the insured's attorneys would "contradict the personal nature of the attorney-client relationship, which permits a legal malpractice action to accrue only to the attorney's client").

Other jurisdictions have acknowledged the potential for interference with the attorney-client relationship but have held that it is trumped by other public policy considerations, primarily that of requiring the malpracticing attorney to bear the cost of his malpractice. This approach is best illustrated by *National Union Insurance Co. v. Dowd & Dowd, P.C.,* 2 F.Supp.2d 1013 (N.D.Ill.1998), the case primarily relied on by CNA and cited by the trial court as justification for its denial of Querrey's and Sanders' summary judgment motions. In *Dowd,* the insured was a self-insured company and National Union was the excess insurer that sued the insured's attorney for legal malpractice. The case arose under Illinois law, and the federal district court predicted that the Illinois Supreme Court would conclude that an excess insurer "should be allowed to assert a legal malpractice claim against its insured's defense attorney under the doctrine of equitable subrogation." *Id.* at 1027. In making its determination, the *Dowd* court examined cases from numerous jurisdictions and determined that because the "degree of damage caused to the attorney-client relationship" was low, the public policy of making the attorney pay for his malpractice outweighed the public policy of safeguarding the personal nature of the attorney-client relationship. *Id.*

Based upon its interpretation of cases such as *Dowd,* CNA argues that a legal malpractice suit by an excess insurer based upon equitable subrogation does not interfere with the relationship between the attorney and the client nor result in additional conflicts of interest because the insurer is only enforcing existing duties of defense counsel to the insured. *See American Centennial Insurance Co. v. Canal Insurance Co.,* 843 S.W.2d 480 (Tex.1992). CNA further argues that there is no conflict where an excess insurer "does not predicate liability on tactical decisions by trial counsel implicating conflicting interests between the insured and the insurer." *Id.* at 484–85.

We agree with those jurisdictions that hold that subrogation amounts to an assignment as "each operates to transfer from one person to another a cause of action against a third, and the reasons of policy which make certain causes of action nonassignable would seem to operate as forcefully against transfer of such causes of action by subrogation." *Capitol Indemnity Corp. v. Fleming,* 203 Ariz. 589, 58

P.3d 965 (2002), *rev. denied* (quoting *Fireman's Fund*, 30 Cal.App.4th 1373, 36 Cal. Rptr.2d 424). As noted above, Indiana does not allow assignments of legal malpractice actions. The potential for conflict is ever present, and we do not deem it appropriate that the attorney's loyalty should be divided.

Additionally, we do not agree with those jurisdictions that hold the possibility of the attorney garnering a windfall by not having to defend against his or her malpractice outweighs the sanctity of the attorney-client relationship. Although the insured may not be as vigilant when it has contracted for excess insurance, it still possesses the right to pursue a malpractice claim. Thus, the attorney is not getting a free ride.[3]

CNA purports to raise the issue of whether the assertion of public policy regarding the sanctity of the attorney-client privilege acts as a violation of the "open courts" provision of the Indiana Constitution. *See* Ind. Const. art. 1, § 12.[4] However, CNA uses this constitutional provision as a vehicle for re-asserting arguments already made and rejected in this opinion. It does not cite to case law interpreting the provision or make an argument as to how the provision has been violated in the present case. Article 1, § 12 is not an incantation and more is required than mere declaration.

In the instant case, the trial court erred as a matter of law in determining that CNA could bring a legal malpractice action against another entity's attorneys.

## II.

In its summary judgment order, the trial court opined:

> As noted, Defendants premise their arguments by characterizing CNA as a "remote excess insurer." Based upon the record presented, there is a question of fact as to whether CNA was a "remote" excess insurer as Defendants argue. The record indicates that ICON notified CNA of the underlying litigation on June 25, 2001. From that date forward, it appears that CNA received routine and confidential client communications which the defendant attorneys were sending to ICON/Jumpking. Thus, it appears that Defendants treated CNA within the confidential boundaries of the attorney-client relationship.

> As such, this court finds a question of fact exists about the professional relationship between the Defendants, Jumpking and CNA from the record before it. Upon that basis alone, defendants' motion on its first argument cannot be granted.

Appellants' App. at 10.

▮▮▮ An attorney-client relationship need not be express; it may be implied by the conduct of the parties. *In re Matter of Kinney*, 670 N.E.2d 1294, 1297 (Ind.1996). However, there must be evidence of a consensual relationship, existing only after both the attorney and client have consent-

---

3. Although the issue is not before us and has not been decided by an Indiana appellate court, we note that at least one federal court has predicted that Indiana will allow an excess insurer to bring an action against a primary insurer under equitable subrogation for negligent defense of a claim against the insured. *See Phico Insurance Co. v. Aetna Casualty and Surety Co. of America*, 93 F.Supp.2d 982, 990 (S.D.Ind.2000).

4. Art. 1, § 12 provides in full: "All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay."

ed to its formation. *Id.* Nowhere in the correspondence with CNA, which was dated more than a year after the alleged legal malpractice and came from ICON, are there any indicia of dual representation at the time of the alleged malpractice or anytime thereafter. While showing communication between CNA and ICON, the correspondence falls far short of establishing a fact question as to whether ICON's attorneys consented to represent both their client and the excess insurer. There is no material issue of fact here.

## III.

Querrey contends that the trial court erred in determining that there was a fact question pertaining to Querrey and Sanders' defense that CNA failed to file their legal malpractice action before the expiration of the two-year statute of limitations.[5] We agree with the trial court's determination but emphasize its import is blunted by our resolution of issues I and II.

We remand with instructions that the trial court enter summary judgment for Querrey and Sanders.

SHARPNACK, J., and BAILEY, J., concur.

---

5. Sanders raised the issue in his appellee's brief but erroneously conceded that the issue was waived because it was not stated in the trial court's certification order. An interlocutory appeal is brought from the original interlocutory order, not from any single issue.