In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3224

THOMAS ROSENBAUM, et al.,

*Plaintiffs-Appellants*,

*v.*

BEAU J. WHITE, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 06 CV 0352—**Theresa L. Springmann**, *Judge.*

ARGUED JUNE 7, 2012—DECIDED AUGUST 16, 2012

Before MANION, KANNE, and HAMILTON, *Circuit Judges.*

MANION, *Circuit Judge.* In 2005, two attorneys, Beau Jack White and James Beaman, assisted a securities broker-turned-real estate investor named Chad Seybold in developing an investment plan to buy, rehabilitate, and then sell, or refinance and rent, various residential and commercial properties in Marion, Indiana. That plan involved the creation of two business entities—one of which would be partially owned by a

group of private investors. The attorneys were hired to draw up the necessary formation documents for those two companies. Seybold then solicited a group of investors who became part owners of one of the companies, together contributing more than $1 million to the investment plan. Soon, however, Seybold informed the investors that the investment plan had failed. The investors filed a lawsuit against Seybold, the attorneys, and various organizations that they blamed for their losses. The defendant-attorneys—now the only defendants remaining in the case—filed a motion for summary judgment on all of the claims levied against them; the plaintiff-investors opposed that motion and filed a counter-motion for summary judgment. The district court granted summary judgment in favor of the defendant-attorneys on all applicable claims. The plaintiffs appeal, and we now affirm.

# I.

Chad Seybold ran several businesses in Indiana and Michigan. One of those businesses, Seytron, LLC, owned thirteen residential and commercial properties in Marion, Indiana, that it had rehabilitated and then rented out. With designs on purchasing more properties and garnering funds to maintain Seytron's existing properties, Seybold sought out investors who would contribute additional capital. To that end, in March 2005, Seybold contacted Beau Jack White, a member of the law firm of Johnson, Beaman, Bratch, Beal and White, LLP, to help him form two new business entities. White

was not experienced in corporate law so he referred Seybold's request to James Beaman, a senior member of the firm, who was more versed in that area of the law.

On April 1, 2005, Beaman met with Seybold to discuss forming the two new business entities which were named Seytron Property Holding, LLC, and Seytron Investors No. 1, LLC. According to Seybold's plan, Seytron Property Holding, LLC, whose members would be Seybold and two other individuals, would hold a 51% stake in Seytron Investors No. 1, LLC. The remaining 49% ownership interest in Seytron Investors No. 1, LLC would come from investments by individuals or financial organizations that would be pitched through private offerings. Additionally, the investors would have to provide personal guarantees for Seytron Investors No. 1, LLC to borrow up to $450,000 from a lending institution.

The investors' personal investments, together with the loan secured by the investors' personal guarantees, would function as a line of credit for the aforementioned Seytron, LLC to maintain its existing properties and also to purchase new residential and commercial properties, rehabilitate those properties, and then either sell or remortgage and rent the properties. (Seybold hoped that the investment plan could be structured so that another one of his business entities, Seycad Construction, LLC, would be the exclusive contractor that would work on the properties.) Any profit above the initial investment would be distributed to Seytron, LLC, and members of Seytron Investors No. 1, LLC. After

briefly discussing these particulars and a few ancillary issues with Seybold, Beaman conducted some preliminary research into Indiana securities laws in preparation for drafting formation documents.

Seybold, Beaman, and White met at the law firm office in Marion, Indiana, on the morning of April 9, 2005. Seybold brought a stockbroker named Victor Whang to the meeting. Whang had taken a real estate investment class and was interested in investing in Seybold's plan on behalf of two people—plaintiff Veying Tone, who was one of Whang's clients, and Whang's mother, plaintiff Royce Whang. Whang testified that Seybold was proud of the fact that he had hired a law firm to set up the two business entities and therefore wanted Whang to meet the attorneys who were drawing up the necessary documents to protect potential investors. Seybold was evidently courting Whang, who had ties to several potential investors. The meeting at the law firm was brief, consisting of introductions and a confirmation to Whang that Beaman and White were the attorneys who "were drawing up the paperwork and representing the group of investors or whoever was going to be investing in this plan." Seybold, Whang, and White then left the law firm office to go to an investment seminar that Seybold had scheduled for that same day. White testified that he attended the seminar at Seybold's behest to explain the concept of limited individual liability afforded by the LLC structure.

The investment seminar was Seybold's first formal invitation to investors to purchase a stake in Seytron

Investors No. 1, LLC. Plaintiffs Rick and Elizabeth Sandusky and Dr. Thomas Rosenbaum (along with Dr. Rosenbaum's wife, who is not a plaintiff) had attended the same real estate investment class as Whang. They all attended Seybold's seminar as potential investors. Whang, who, as we mentioned earlier, attended on behalf of his mother and a client, videotaped the seminar so that he could present the plan to other potential investors. At the outset of the seminar, Seybold introduced several participants in the investment plan, including his brother, Wayne, who was the mayor of Marion; Lupe Cadena, who was Seybold's partner in Seycad Construction, LLC; an insurance agent; Seybold's father, John, who was an experienced real estate adjuster; and White, whom Seybold introduced as "the attorney who's helping us structure the company."

Seybold talked at length about his investment plan, highlighting the numerous protections that the investors would have. After talking for more than an hour, Seybold asked White whether he would like "to add anything on the creation of the company." White began his presentation by addressing a concern raised by a prospective investor about potential conflicts of interest with Seybold's other companies. White explained that those issues could be addressed in the operating agreement. In addition to other structural protections already discussed by Seybold, White noted that he and the law firm were looking into how to avoid certain securities-laws issues that might arise from the creation of the company. More generally, White

explained that, by structuring the investment venture as an LLC, the investors would be insulated from personal liability in the event a suit was filed against the company. In other words, as White put it, the only thing at risk was the investors' investment in the LLC. Finally, Seybold added the following comments:

> I think that the other important thing to note here is—that you've got to remember is—that [the attorneys] don't represent me. They represent Seytron Property Holdings, okay? That means that they represent you as well. So they're not only looking out for my best interest as well and my best interest also as a partner in this group. So it's not like—I don't want anybody to get the impression that they're setting this up to where it benefits me and that you guys are going to be left hanging in the breeze. The total discussion that we've had is that I'm part of an owner in Seytron Property Holdings just like you and your interest needs to be protected first to make sure that your dollars are safe and then second that we're protected as a group both in our personal lives as well as within the company. So, [the attorneys] are working for you just like they are working for me.

White stood next to Seybold as Seybold made these comments and made no attempt to clarify or correct him.

After the seminar, Dr. Rosenbaum introduced himself to White. According to Dr. Rosenbaum, White gave him a business card, told him to call if he had any questions, and indicated to him that White would be representing

"the people potentially who would invest in the Seytron Investors No. 1, LLC." Mrs. Sandusky also spoke to White briefly after the seminar. She obtained his business card and came away with the impression that White "was our attorney and was there to protect our interests." Mr. Sandusky did not speak to White. Later in the day, the prospective investors went from there on a tour of Marion with Seybold and his brother Wayne, the mayor.

In the weeks that followed, Beaman drafted the articles of organization for both Seytron Property Holdings, LLC, and Seytron Investors No. 1, LLC. Beaman executed the articles on April 27, 2005, and filed them with the State of Indiana. Beaman then turned his attention to the operating agreements for both companies, which he revised several times after reviewing the agreements with Seybold during May 2005. Notably, on its final page, the completed operating agreement for Seytron Investors No. 1, LLC contained signature lines for the members (i.e., those prospective investors who decided to invest) and the following bolded disclaimer: "**WE CERTIFY THAT WE HAVE READ THE ABOVE OPERATING AGREEMENT IN DETAIL AND HAVE HAD THE OPPORTUNITY TO REVIEW SAID OPERATING AGREEMENT WITH OUR LEGAL COUNSEL AND/OR ACCOUNTANT.**"[1] Beaman

---

[1] Although the operating agreement provided in the record does not contain any actual signatures, the plaintiffs do

(continued...)

also worked on a subscription and loan agreement in May 2005, as well as a promissory note in June 2005. There is no record of White, Beaman, or the law firm performing any work for Seybold or the two companies after June.

Over the course of the next several months, and even into the Spring of 2006, Seybold held at least two more seminars and conducted other meetings for prospective investors. The presentations were identical to the first seminar, though neither White nor anyone else from the law firm was in attendance. Like those who had attended the April 9, 2005, seminar, most of these prospective investors were either Whang's clients or people who had attended the aforementioned real estate investment class with him.

There was, however, another investor, Ray Leggett, who was outside of Whang's sphere of influence. Leggett met Seybold while working as a broker in Michigan. After Seybold pitched his investment plan to Leggett, Leggett and ten other individuals formed plaintiff RFL Financial, LLC, for the purpose of investing with Seybold. Soon thereafter, Leggett began making trips to Marion to research Seybold's investment plan. On one of those trips, Leggett accompanied Seybold to the law firm where Leggett briefly met White. Leggett later described the exchange as follows:

---

[1] (...continued)

not dispute that this agreement is indeed the one that they signed.

> I believe what I said to the attorney was something like, so you're the famous lawyer that I've heard is working for us. I shook his hand. He said, yes, hello. [Seybold] introduced us. I was also told by [Seybold] himself in front of [White] that, yes, this is the law firm that is working on our behalf for you, for the investors.

Leggett did not have any more contact with White, Beaman, or any other attorney at the law firm. Notably, aside from Whang, Leggett, and the individuals who attended the April 9, 2005, seminar, none of the prospective investors met White, Beaman, or any other law firm representative. Instead, they all relied on representations by Seybold, Whang, and Leggett that the attorneys were looking out for the investors' interests.[2]

Eventually, the plaintiffs went from prospective investors to part owners of Seytron Investors No. 1, LLC. As we mentioned above, this entailed purchasing a stake in the company as well as signing as a security for a loan. The majority of these investments took place no earlier than August 2005, and ranged from $10,000 to $220,000. In total, the plaintiffs invested more than $1 million in Seybold's plan. Then, in September or October 2006, Seybold called a meeting with all of the

---

[2] As noted above, most of the prospective investors' connections to Seybold came through Whang. One exception, however, is Sean Smolski, who later became an investor and is a plaintiff in this case, and was introduced to Seybold by Leggett.

investors. Whang attended on behalf of his mother and Veying Tone; Leggett attended on behalf of RFL Financial; and the Sanduskys, Gary and Joni Kasaczun, William Method, Delen Tennyson, Ron Hood, and Robert Sexton also attended. At the meeting, Seybold informed the investors that their investments were gone, that he was filing for bankruptcy, and that the investors were free to try to salvage the investment plan if they so desired. Seybold explained that the real estate market had taken a downturn, causing property values to fall and making refinancing impossible. Moreover, the rehabilitation costs had increased and suppliers had stopped allowing Seybold to order materials on credit. In short, Seybold's plan had failed. Sometime in the Fall of 2006, Dr. Rosenbaum, Whang, and Leggett all attempted to contact White and the law firm; none of them received a response. The investors therefore decided to hire independent legal counsel to represent them.

On October 26, 2006, believing that Seybold had bilked them out of their investments, the investors filed suit in the Northern District of Indiana against Seybold and a number of his business entities and associates. The investor-plaintiffs amended their complaint four times, eventually adding Seytron Property Holdings, LLC, and Seytron Investors No. 1, LLC as plaintiffs and more than fifteen individuals and entities as defendants—including White, Beaman, and the law firm. The plaintiffs alleged a host of federal-law claims, along with both Indiana and Michigan state-law claims. Eventually, by June 2010, the case had been whittled down so

that the attorneys were the only defendants remaining in the case.

White, Beaman, and the law firm filed a motion for summary judgment on all of the claims that the plaintiffs filed against them: state and federal RICO violations, conversion, federal and state securities fraud, common-law fraud (both actual and constructive), civil conspiracy, and legal malpractice. The plaintiffs opposed the defendants' summary judgment motion and filed their own counter-motion. After noting that the plaintiffs had waived their RICO and conversion claims, the district court granted the defendants' motion for summary judgment on the rest of the challenged claims, and the plaintiffs appealed.

## II.

We review de novo the district court's granting of summary judgment. *Musch v. Domtar Indus., Inc.*, 587 F.3d 857, 859 (7th Cir. 2009). In doing so, we will construe all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *Id.* When considering cross-motions, "'our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made.'" *Allen v. City of Chicago*, 351 F.3d 306, 311 (7th Cir. 2003) (quoting *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

On appeal, the plaintiffs contend that the district court erred in granting summary judgment on the following claims: (1) legal malpractice; (2) violations of § 10(b) of the Securities Act of 1934 and Rule 10b-5, and of Indiana securities laws (collectively referred to as the "securities-fraud claim"); (3) actual fraud; (4) constructive fraud; and (5) civil conspiracy. The main thrust of the plaintiffs' case rests on whether the defendants owed them a legal duty. The district court held that the defendants did not owe the plaintiffs a duty—a holding that disposed of not only the plaintiffs' legal-malpractice claim, but also their constructive-fraud and securities-fraud claims (although the district court cited alternate grounds for dismissing the latter two claims as well). We will therefore begin by addressing whether the plaintiffs have established the existence of a duty, and then we will move on to discuss the two remaining claims (actual fraud and civil conspiracy) on which the existence of a legal duty has no bearing.

### A.  Legal Duty (Legal Malpractice, Constructive Fraud, and Securities Fraud)

Three of the plaintiffs' claims hinge on whether the defendants owed them a legal duty. This determination is a question of law within the exclusive province of the courts. *Campbell v. Eckman/Freeman & Assocs.*, 670 N.E.2d 925, 931 (Ind. App. Ct. 1996) (citation omitted). Two of the relevant claims, legal malpractice and constructive

fraud, are Indiana state-law claims. We will address those claims first before moving to the plaintiffs' third claim—securities fraud.[3]

### 1. Legal Malpractice and Constructive Fraud

The existence of a legal duty is an essential element of the plaintiffs' legal-malpractice and constructive-fraud claims. *See Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. App. Ct. 1996) (listing the elements for both claims and noting that the "plaintiffs' claims for both attorney malpractice and constructive fraud depend upon the existence of a duty running from defendants to plaintiffs"). Generally, determining whether a defendant owes a duty "to conform the defendant's conduct to a certain standard for the benefit of the plaintiff requires that three factors be balanced: (i) the relationship between the parties, (ii) the reasonable foreseeability of harm to the person injured, and (iii) public policy concerns." *Id.* (citing *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991)). Here, the plaintiffs assert two different theories

---

[3] The plaintiffs combined their federal and state securities-fraud claims into one count in their Fourth Amended Complaint (Count 4). As the district court noted, the plaintiffs' arguments are identical for both their federal and state securities-fraud claims, and they have made no attempt to distinguish between the two types of claims on appeal. Thus, when the time comes, we will confine our analysis to federal law only, recognizing that the fate of the plaintiffs' federal and state securities-fraud claims is the same.

under which they attempt to show that the defendants owed them a duty. First, the plaintiffs allege that they each established an attorney-client relationship with the defendants. Second, the plaintiffs allege that, even if they did not establish an attorney-client relationship with the defendants, the defendants still owed them a duty under the Indiana Rules of Professional Conduct.

First, and more specifically, the plaintiffs contend that the defendants formed an attorney-client relationship with each individual investor (even those investors who had never met any of the attorneys), and that each relationship lasted past the formation of the LLCs, extending continuously during the operation of the investment plan. These attorney-client relationships, the plaintiffs argue, gave rise to a legal duty that the defendants owed to each investor.

"[T]o show the existence of an attorney-client relationship, the existence of duty will turn initially on the relationship of the parties. That is, if an attorney-client relationship does not exist, it will not be necessary to reach the foreseeability and public policy factors." *Id.* The record is devoid of evidence that the parties entered into a formal, express attorney-client relationship. Nevertheless, "[a]n attorney-client relationship need not be express; it may be implied by the conduct of the parties. However, there must be evidence of a consensual relationship, existing only after both the attorney and client have consented to its formation." *Querry & Harrow, Ltd. v. Transcon. Ins. Co.*, 861 N.E.2d 719, 724-25 (Ind. App. Ct. 2007) (citing *In re Kinney*, 670 N.E.2d 1294, 1297

(Ind. 1996)). One way that Indiana courts have held that an implied attorney-client relationship exists is when " '[a]n attorney has . . . consented to the establishment of an attorney-client relationship[,] there is proof of detrimental reliance, [and] the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it.' " *Douglas v. Monroe*, 743 N.E.2d 1181, 1186 (Ind. App. Ct. 2001) (quoting *Hacker v. Holland*, 570 N.E.2d 951, 956 (Ind. App. Ct. 1991)). Although "[a]n important factor is the putative client's subjective belief that he is consulting a lawyer in his professional capacity and on his intent to seek professional advice, . . . [a] would-be client's unilateral belief cannot create an attorney-client relationship." *Id.* at 1184-85 (internal quotation marks and citations omitted).

To begin, we recognize that the defendants did in fact form an attorney-client relationship with two of the plaintiffs: Seytron Property Holdings, LLC, and Seytron Investors No. 1, LLC. Indeed, the attorneys were retained by Seybold, who was the investment plan's architect and the two companies' registered agent, to participate in the companies' formation by drafting articles of organization, operating agreements, a subscription and loan agreement, and a promissory note. *See Cutshall v. Barker*, 733 N.E.2d 973, 981 (Ind. App. Ct. 2000) (citations omitted) ("[A] lawyer who is retained by a corporation represents that corporation acting through its duly authorized constituents."). This relationship was indisputably limited in scope as well as duration—Seybold hired the attorneys for the sole purpose of

drafting formation documents. The attorneys completed this task in June 2005 and, according to the record before us, had no further involvement with Seybold or the companies.

So there is no question that the defendants owed a duty to Seytron Property Holdings, LLC, and Seytron Investors No. 1, LLC "to exercise ordinary skill and knowledge" in drafting the formation documents. *Rice*, 670 N.E.2d at 1284 (citation omitted). But the plaintiffs do not argue that the defendants breached a duty when drafting the companies' formation documents. Thus, even though the two companies did enjoy a limited attorney-client relationship with the defendants, there are no issues with that relationship that are before us on appeal. Instead, as noted above, the plaintiffs solely argue that the defendants formed a broad attorney-client relationship with each individual investor for the duration of the investment plan. We will therefore confine our analysis to that purported relationship.

In making this argument, the plaintiffs point to White's presentation at the April 9, 2005, seminar, along with his brief conversations with Seybold, Whang, Dr. Rosenbaum, Mrs. Sandusky, and Leggett, as sufficient evidence to imply the existence of an attorney-client relationship with each individual investor. The plaintiffs highlight Seybold's monologue during White's presentation at the April 9 seminar. There, Seybold assured the plaintiffs that the attorneys "are working for you just like they are working for me." The plaintiffs complain that White, who was standing just

a few feet away, said nothing to correct Seybold.[4] Most of the plaintiffs never met White, Beaman, or any other attorney at the law firm. Yet the plaintiffs argue that White's limited interaction with a few plaintiffs, coupled with his presentation at the April 9 seminar, was relayed to them by Seybold, Whang, or Leggett.

---

[4] The plaintiffs contend that, after viewing a DVD recording of his presentation at the April 9 seminar, White admitted during his deposition that it was reasonable for potential investors to believe that they had an attorney-client relationship with the defendants. This assertion is based on the plaintiffs' faulty reliance on an excerpt of White's deposition. After plaintiffs' counsel paraphrased Seybold's monologue during White's presentation at the April 9 seminar, counsel asked White a series of questions: "Could you see how a person could believe that we're giving money to the company. And the company spending money on the attorneys, I think he is my attorney? Do you think that would be completely unreasonable?" To this White replied, "I don't see that, no." Counsel asked two questions, yet White gave only one answer. Depending on one's point of view, White's response could be construed in favor of either party. But this ambiguity was created by plaintiffs' counsel's own compound question, and we will not allow the plaintiffs to create a triable issue of fact by purposefully or accidentally creating such an ambiguity. Moreover, as the district court correctly noted, it is evident from the context of White's testimony that he did not believe that it was reasonable to believe that an attorney-client relationship had been formed. Accordingly, we reject the plaintiffs' contention that White has admitted that potential investors could have reasonably believed that an attorney-client relationship was established.

Therefore, they claim that they reasonably relied on the fact that the attorneys were representing each of them individually when they made the decision to invest in Seybold's plan.

It is important to put White's brief presentation at the April 9 seminar in context. White's presentation was approximately seven minutes out of the several hours that Seybold spent pitching his plan to the prospective investors. Significantly, Seybold prefaced White's presentation to the group by asking whether White wanted "to add anything on the creation of the company." Consistent with that introduction, White's subsequent comments all related to the LLCs' formation. White began by addressing a concern raised by a prospective investor about preventing conflicts of interest with Seybold's other companies. White explained that those issues could be addressed in the operating agreement. Further, White noted that he and the law firm were looking into how to avoid certain securities-laws issues that might arise from the creation of the LLCs. And White also explained that, by structuring the investors' company as an LLC, the investors would be insulated from personal liability in the event a suit was filed against Seytron Investors No. 1, LLC. These explanations are consistent with White's stated purpose for attending the seminar. Moreover, they describe the exact purpose for which White and the law firm were hired—namely, to structure the LLCs in the most economically fair and efficient way possible. No investor could have reasonably believed that the defendants would be professionally involved with the plan past the point of the LLCs' formation.

Seybold's monologue during White's presentation at the April 9 seminar is also insufficient to imply an attorney-client relationship between the parties. The plaintiffs make much of Seybold's representation to the potential investors—and White's failure to correct him—that the attorneys "are working for you just like they are working for me." But Seybold began his statement by saying, "I think that the other important thing to note here is—that you've got to remember is—that [the attorneys] don't represent me. They represent Seytron Property Holdings, okay? That means that they represent you as well." Additionally, Seybold introduced White at the beginning of the seminar as "the attorney who's helping us structure the company." Thus, it is clear that, when taken in context, Seybold's statements were intended to provide assurances that the attorneys were hired to represent the two new LLCs during their formation. White and the other defendants obviously envisioned the relationship in this limited fashion, and the record clearly shows that there was no legal relationship once the formation documents were prepared. None of the potential investors could have reasonably believed that Seybold's monologue provided each of them with a personal attorney-client relationship for the indefinite future. We will not imply an attorney-client relationship based on Seybold's comments.

White's and Beaman's brief meetings with a few of the plaintiffs confirm that no reasonable investor could have believed that the attorneys were hired to represent the investors individually for the duration of the LLCs'

operation. In fact, the record shows that the plaintiffs who met the attorneys subjectively did *not* believe that. Whang met with White and Beaman at the law firm before the April 9 seminar, and Whang came away from that meeting with the impression that the attorneys "were drawing up the paperwork and representing the group of investors or whoever was going to be investing in this plan." Dr. Rosenbaum testified at his deposition that, based on information given at the seminar and his brief meeting with White afterwards, he believed that "Beau White represent[ed] the investors," specifically, "the people potentially who would invest in Seytron Investors No. 1, LLC." Further, Dr. Rosenbaum understood that the attorneys were providing Seybold "some information . . . for the benefit of the company, and they're helping [Seybold] set up this investment company." Mrs. Sandusky, who, like Dr. Rosenbaum, met with White briefly following the seminar, similarly testified that she believed that White "was our attorney and was there to protect our interests." And Leggett's meeting with White produced the same understanding—namely, that the law firm was "working on our behalf for you, for the investors." The testimony of each plaintiff who met White or Beaman reflects a common understanding that the attorneys were hired to represent the investors collectively and for the purpose of forming the companies involved in the investment plan.

There is yet another compelling reason why none of the plaintiffs can establish the existence of an attorney-client relationship. This includes those who did not meet

the defendants but instead relied on the assurances of Seybold, Whang, or Leggett. When the plaintiffs invested in Seybold's plan, they each signed the Seytron Investors No. 1, LLC operating agreement, thus averring that they had been given "**THE OPPORTUNITY TO REVIEW SAID OPERATING AGREEMENT WITH OUR LEGAL COUNSEL AND/OR ACCOUNTANT**." This statement, written exactly as we portray it here and placed directly above the signature lines in the operating agreement, would alert a reasonable investor that he is not represented personally—much less perpetually—by the attorneys who were hired to draft the agreement.

Taken as a whole, no investor could have reasonably believed that he enjoyed a personal, indefinite attorney-client relationship based on the representations made by the defendants and Seybold. Further, several plaintiffs' subjective beliefs demonstrate that they understood that the defendants were acting on behalf of the investors as a group, not individually, and that the defendants' involvement in the investment plan did not last beyond the companies' formation. And the disclaimer included in the operating agreement that each investor signed should have alerted a reasonable investor that the defendants were not representing them in their personal capacities. Given these facts, we will not imply an attorney-client relationship between the individual plaintiffs and the defendants.

But the plaintiffs also argue that, even if no attorney-client relationship existed, the defendants still owed them a duty under the Indiana Rules of Professional Conduct. The plaintiffs cite a number of rules that the

defendants allegedly violated, most especially Rule 4.3, which lays out a lawyer's responsibility when dealing with unrepresented persons: "When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer shall not give legal advice to an unrepresented person, other than the advice to secure counsel." IND. RULES OF PROF'L CONDUCT R. 4.3.

We need not delve into these arguments, however, because it is quite clear that the Indiana Rules do not create a legal duty. As the Indiana Supreme Court put it, "the Preamble [of the Rules] 'makes it clear that the Rules of Professional Conduct do not purport to create or describe any civil liability.'" *Liggett v. Young*, 877 N.E.2d 178, 183 (Ind. 2007) (quoting *Sanders v. Townsend*, 582 N.E.2d 355, 359 (Ind. 1991)). The relevant language of the Preamble is as follows:

> [20] Violation of a Rule should not itself give rise to a cause of action against a lawyer, nor should it create any presumption in such a case that a legal duty has been breached. In addition, violation of a Rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability, but these Rules may be used

as non-conclusive evidence that a lawyer has breached a duty owed to a client. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule.

IND. RULES OF PROF'L CONDUCT PREAMBLE. Although the Rules may form a standard of conduct by which a lawyer's duty can be measured, such a duty must arise from common law and may not be predicated on the Rules themselves. *See id.*; *Liggett*, 877 N.E.2d at 183. We thus reject the plaintiffs' argument that the Rules created a legal duty on the part of the defendants.

In sum, the plaintiffs have not demonstrated the existence of an attorney-client relationship, nor have they established a basis for any other legal duty owed to them by the defendants. Accordingly, the plaintiffs' legal-malpractice and constructive-fraud claims fail.

## 2. Securities Fraud

The issue of whether a legal duty exists also affects the plaintiffs' securities-fraud claim.[5] The plaintiffs

---

[5] The plaintiffs' securities-fraud claim in Count 4 of their Fourth Amended Complaint did not name the attorney-defen-

(continued...)

allege that White's presentation at the April 9, 2005, seminar contained material falsehoods on which the plaintiffs relied when investing in Seybold's plan. Specifically, the plaintiffs point to White's silence during Seybold's monologue where he assured the potential investors that the attorneys "are working for you just like they are working for me." Additionally, the plaintiffs argue, White should have disclosed his inexperience with business and securities law during his presentation at the seminar. The plaintiffs assert that White's silence led them to forego obtaining independent legal counsel before deciding to invest.

It is axiomatic in the context of securities law that an alleged omission cannot be fraudulent "absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 235 (1980). And as we have stated elsewhere, "[t]he duty to speak comes from a fiduciary relation established by state law." *Ackerman v. Schwartz*, 947 F.2d 841, 846 (7th Cir. 1991) (citations omitted). In the previous section, we detailed the plaintiffs' failure to establish such a relationship under state law. Absent such a relationship, White had no duty to respond to Seybold's statements,

---

[5] (...continued)

dants. Instead, the plaintiffs argued that their civil-conspiracy claim—Count 14 of the Fourth Amended Complaint—includes the allegation that the defendants acted in concert with Seybold to commit securities fraud. Nevertheless, the district court and the parties have addressed the securities-fraud claim as an independent claim, and so we will address it on its merits.

and thus any omission on White's part was not fraudulent. Accordingly, the plaintiffs cannot maintain a securities-fraud claim and the district court properly granted the defendants summary judgment on this claim as well.

### B.  Actual Fraud

The plaintiffs next contend that the district court erred in holding that they failed to establish a claim for actual fraud against the defendants. An actual-fraud claim consists of the following elements:

> (1) a material misrepresentation of a past or existing fact which (2) was untrue, (3) was made with knowledge of or in reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) which proximately caused the injury or damage complained of.

*Wheatcraft v. Wheatcraft*, 825 N.E.2d 23, 30 (Ind. App. Ct. 2005) (citing *Lawyers Title Ins. Corp. v. Pokraka*, 595 N.E.2d 244, 249 (Ind. 1992)). The district court held that the first element was dispositive here—namely, that because the defendants' alleged representations all regarded future conduct and did not address past or existing facts, the plaintiffs could not maintain an actual-fraud claim. The plaintiffs cry foul, pointing to White's endorsement-by-silence of Seybold's statements during White's presentation at the April 9 seminar, as well as White's assurance that his law firm would handle the formation of the LLCs.

"Actual fraud may not be based upon representations of future conduct, broken promises, or representations of existing intent that are not executed." *Ruse v. Bleeke*, 914 N.E.2d 1, 10 (Ind. App. Ct. 2009) (citation omitted). At the April 9 seminar, Seybold assured the investors that the attorneys would be looking out for everyone when forming the companies. White commented on the limited liability that the LLC structure afforded investors, and briefly described the attorneys' attempts to avoid securities law and to draft operating agreements that avoided conflicts of interest with Seybold's other companies. All of these statements necessarily concerned future conduct or were representations of existing intent that had not yet been executed. The main topic of conversation at the April 9 seminar—namely, the formation and structure of the LLCs—was hypothetical because none of the investors had yet decided on whether to invest in Seybold's plan. And, as White later testified, the future was quite uncertain: "[W]e . . . had been contacted to perhaps set up the entities. So as I sit there, I don't know what is going to happen from that point on. [The potential investors] could decide to not have us do anything." Accordingly, the representations from the April 9 seminar on which the plaintiffs rely cannot form the basis of an actual-fraud claim. The district court properly entered summary judgment against the plaintiffs on this claim.

## C. Civil Conspiracy

"A civil conspiracy is a combination of two or more persons who engage in a concerted action to accomplish

an unlawful purpose or to accomplish some lawful purpose by unlawful means." *K.M.K. v. A.K.*, 908 N.E.2d 658, 663 (Ind. App. Ct. 2009) (citing *Boyle v. Anderson Fire Fighters Ass'n Local 1262*, 497 N.E.2d 1073, 1079 (Ind. App. Ct. 1986)). In Indiana, there is no independent cause of action for civil conspiracy. *Id.* But a plaintiff may sue for damages that result from such a conspiracy if he can demonstrate that the defendants acted in concert with another party in the commission of an independent tort. *See id.* at 663-64. The plaintiffs alleged that the defendants conspired with Seybold to commit the following independent torts: securities fraud, federal and state RICO violations, conversion and theft, actual fraud, larceny by conversion, and usurpation of business and investment opportunities.

We need not address the merits of each independent tort (although we did so above with the plaintiffs' securities-fraud claim) because the plaintiffs have failed to demonstrate that the defendants acted in concert with Seybold to commit any unlawful act, or that they accomplished a lawful purpose through unlawful means. There is no evidence that, nor do the plaintiffs contend that, the substance of the work that Seybold hired the defendants to perform was unlawful. The record evidence shows that the defendants drafted the articles of organization, operating agreements, a subscription and loan agreement, and a promissory note. They had no involvement with soliciting or managing investments. At bottom, the defendants performed lawful work to accomplish the lawful purpose of forming LLCs for Seybold's investment plan. This work was

completed by June 2005—two months before the first investments poured in. Thus, even if Seybold acted nefariously with the investments, because there is no evidence that the attorneys performed work for, or even maintained contact with, Seybold or the LLCs beyond that date, the plaintiffs cannot succeed on their civil-conspiracy claim. Thus, the district court properly granted summary judgment to the defendants on this claim as well.

### III.

The plaintiffs failed to establish either that an attorney-client relationship existed or that the defendants owed them some other legal duty. Accordingly, the district court properly granted the defendants summary judgment on the plaintiffs' legal-malpractice, constructive-fraud, and securities-fraud claims. And because the plaintiffs relied solely on representations by the defendants that concerned only future conduct, or on representations of existing intent that were not yet executed, the plaintiffs' actual-fraud claim also cannot survive summary judgment. Finally, the plaintiffs failed to provide any evidence that the defendants acted in concert with Seybold to commit an unlawful act or to accomplish a lawful purpose through unlawful means. Thus, the district court did not err in granting the defendants summary judgment on the plaintiffs' civil-conspiracy claim. For these reasons, we AFFIRM.